Louise LAMPHERE

v.

BROWN UNIVERSITY et al.

(In Re Appeal of Susanne Woods)

Civ. A. No. 75–0140.

United States District Court,
D. Rhode Island.

April 22, 1980.

Milton Stanzler, Providence, R. I., Jordan Stanzler, Newport, R. I., for plaintiff.

Peter J. McGinn, Richard A. Sherman, Providence, R. I., J. Harold Flannery, Boston, Mass., for defendants.

## MEMORANDUM OPINION AND ORDER

PETTINE, Chief Judge.

A complaint against Brown University and certain officers, alleging that they were engaged in employment discrimination based upon sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, was resolved by a consent decree entered on September 12, 1977. This decree became a final judgment on March 6, 1978.

The consent decree sets up an Affirmative Action Monitoring Committee, par. 2(L) [which is responsible for monitoring all future hiring, contract renewal, promotion, and tenure decisions] and a Hearing Panel, par. 2(M)(2)(b) [which is charged with hearing claims of class members who may have been discriminated against in hiring, contract renewal, promotion, tenure, and other terms and conditions of employment].

This is an appeal by the claimant, Professor Susanne Woods, from a decision of the Hearing Panel, alleging she has been the victim of sex discrimination since 1972 when she was hired by the English Department. The specific grievance is that males who were not as qualified by experience and training were paid the same salary as she was receiving. For reasons which follow the appeal is denied.

This being the first case reaching this Court for a *de novo* hearing on an appeal from the Hearing Panel, it is appropriate that certain guidelines be established for similar cases that may follow the same path.

Although appeals from the Hearing Panel are *de novo*, requiring the Court to examine the factual allegations of each case, it is not the purpose of these appeals to try the class action which was resolved by the consent decree. Accordingly, these appeals should focus on specific instances of discrimination rather than on evidence of a broad pattern and practice of discrimination at the University. I suspect that these appeals will often turn on the defendant's articulation of a legitimate, nondiscriminatory reason for its action, and the complainant's rebuttal that this reason is pretextual. Consequently, the presentation of massive statistical evidence encompassing the entire University, more appropriate to establishing a *prima facie* case in a class action, will usually not be helpful.

The consent decree specifically provides that in proceedings before the Affirmative Action Monitoring Committee, the Department or Division (*i. e.,* the defendant) will have the burden of proving by clear and convincing evidence that its practices were nondiscriminatory. The decree also provides that there may be a *de novo* consideration of any decision of the Committee by appropriate motion to the Court; and in hearing such motion the Court will apply

the same burden of proof as required before the Committee.[1]

The decree is silent, however, as to who has the burden of proof on a *de novo* appeal from a Hearing Panel Decision. It merely states that if dissatisfied with the action of the Hearing Panel, the claimant or the University may petition the Court for a *de novo* hearing on all the issues. In the absence of specific guidance from the consent decree, I will adopt the standard of proof common to discrimination cases.[2] *See Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106 (1st Cir. 1979). In *Sweeney*, the First Circuit articulated this standard: the plaintiff first establishes a "prima facie case" of discrimination by proving by a fair preponderance of the evidence that she is a member of the protected class, that she was qualified for the position, and that she was paid a lesser salary than similarly situated males, or a salary equal to males of lesser qualifications; this then requires the defendant to "articulate" a legitimate, nondiscriminatory reason for its adverse action regarding the plaintiff; to prevail the plaintiff must ultimately prove by a fair preponderance of the evidence that the reason articulated is a pretext for discrimination. As the First Circuit emphasized in *Loeb v. Textron*, 600 F.2d 1003 (1st Cir. 1979), the defendant's burden is merely "a burden of production—*i. e.*, a burden to *articulate or state* a valid reason," *id.* at 1011; the burden of persuasion remains at all times with the plaintiff.

*The Prima Facie Case*

■ I find that the complainant has established a "prima facie case." Quite obviously a member of the protected class, Professor Woods obtained her Ph.D. in English, specializing in the Renaissance, from Columbia University in 1970. She taught part time at Hunter College and California State College, and from 1969 to the date of her appointment at Brown University, was a full time assistant professor at the University of Hawaii. In 1971 she applied to Brown University for an assistant professorship with the English Department. She accepted an appointment as assistant professor at an annual starting salary of $11,000, even though at the time she was receiving $12,600; she did this because Brown University offered expanded opportunities for research and intellectual growth. She started teaching in the fall of 1972; at this time she met Professors Geoffrey Russom and David Parker, who were appointed when she was, and learned from them that they were also receiving $11,000 a year. Professor Woods thought this was unfair and complained to Professor Spilka, the chairman of the English Department, arguing that they were junior colleagues who had not completed their Ph.D. studies and had no prior teaching experience.

*The Articulated Reason*

Accepting that a *prima facie* case has been made, the next step is to determine if the evidence establishes that the defendants have articulated a nondiscriminatory reason for their actions. Professor Spilka testified that each department is autonomous and has its own budget, which is negotiated with the Provost. At the time the claimant was hired, the chairman was given $33,000 to appoint three assistant professors, one each in Medieval studies, American literature, and Renaissance studies. As to why Professors Russum, Parker and Woods were paid the same initial salary, Professor Spilka stated,

These were tight budget years; salary was fixed with the Provost; we were looking for a beginning assistant professor; in a tight market situation many advanced assistant professors were not going to get tenure at the places where they were staying and they were interested in starting over again elsewhere and

1. In cases that may arise under this section of the Consent Decree, counsel should anticipate a challenge to the validity of this standard of proof in light of the teachings set forth in the cases cited in this Memorandum. The question to be answered is whether a consent decree can alter the burden of proof that would otherwise apply.

2. The parties have agreed to this burden of proof.

just taking the loss in salary they had accumulated; that was Woods' case.

He went on to explain that $11,000 was the "fairly standard salary offering rate" of competing schools and that he could not jeopardize one position for any of the others. He needed three teachers—one in each of three subjects. Woods, Parker and Russom were the best he could get, and he only had $33,000 to spread around, with $11,000 being the irreducible minimum starting point. He did say that if a candidate received a higher offer from another school he would try to negotiate—otherwise he would not. In short, budget constraints and the competitiveness in the market motivated his actions.

Professor Spilka's testimony further established the need for each department to make its own salary decisions based on different market conditions, "*i. e.* the number of Ph.D.s in the market, strength and size of department." (Def's brief p. 12).

■ In determining whether the defendants' articulated reasons meet the *prima facie* case, I am guided by the First Circuit's admonition in *Loeb v. Textron*, 600 F.2d 1003 (1979) that:

> Although the employer has a burden of production rather than of persuasion, "The employer's defense must . . . be designed to meet the prima facie case . . . ," *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360 n.46, 97 S.Ct. 1843, 1867, n.46, 52 L.Ed.2d 396 (1977), and must be sufficient, on its face, to "rebut" or "dispel" the inference of discrimination that arises from proof of the prima facie case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 at 807, 93 S.Ct. 1817 at 1826, 36 L.Ed.2d 668; *Teamsters*, 431 U.S. at 342 n.23, 97 S.Ct. at 1858. A passing reference by just one of many witnesses to some deficiency in the plaintiff's job rating, for example, would be insufficient. Nor would it be enough to offer vague, general averments of good faith—a plaintiff cannot be expected to disprove a defendant's reasons unless they have been articulated with some specificity.

*Id.* at 1011–1012 n.5

Under this standard, I find that defendants have articulated a legitimate, nondiscriminatory reason for the starting salary paid to complainant.

*Pretext*

■ The defendant having articulated a legitimate, nondiscriminatory reason, the burden is on the complainant to prove by a preponderance of the evidence that the articulated reason is a mere pretext. In addressing this issue, the relevant question is not whether defendants' judgment or course of action may seem poor or erroneous to outsiders, but whether the given reason was in fact a pretext for illegal discrimination. *Loeb v. Textron, supra*, at 1012 n.6.

> The employer's stated legitimate reason must be reasonably articulated and non-discriminatory, but does not have to be a reason that the judge or jurors would act on or approve. Nor is an employer required to adopt a policy that will maximize the number of minorities, women, or older persons in his work force. An employer is entitled to make his own policy and business judgments, and may, for example, fire an adequate employee if his reason is to hire one who will be even better, as long as this is not a pretext for discrimination.
>
> The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if indeed it is one. The jury must understand that its focus is to be on the employer's motivation, however, and not on its business judgment.
>
> *Id.* (citations omitted)

■ In arguing that the defendants' articulated reasons are a mere pretext, the complainant focuses on the following: the fact that she was appointed an assistant professor, but was paid a beginner's salary without being so informed; that Brown hired other women, Professors Sirota and Hicks, who were paid less than their male

counterparts; that statistics in the "Annual Report of the Committee on Women Faculty" at Brown University for the years 1972–73–74 [3] show women were paid less than men and that there was "substantial disparity in the number of women hired, promoted, and in tenured positions, in comparison with the National Availability Pool."

I realize that it is difficult to meet the burden of proof in cases such as this. It must be kept in mind, however, that it is not relevant whether Professor Spilka and others exercised sound judgment; the only issue is whether they were unlawfully motivated. After reviewing the complainant's contentions, I find that she has not established by a preponderance of the evidence that the defendants' articulated reasons for her salary level were mere pretexts for sex discrimination.

As to Professor Woods' first contention, it is rather difficult to accept her complaint as legitimate that she should not have been paid a beginner's salary without having been so informed. Professor Woods actively sought this job, and in exchange for an atmosphere more conducive to scholarly work, she took a substantial reduction in pay and a beginning assistant professorship. It was obvious from the claimant's testimony and demeanor on the stand that she was not naive as to the hiring practices of 1972, and as to what was best for her academic future. I accept Professor Spilka's statement that at the time it was widely known that an assistant professorship meant a starting job at a beginner's salary, whereas prior thereto one began with an instructorship.

The claimant's effort to bolster her case by going back to 1967 and selecting Profes-

sors Sirota and Hicks as examples also fails to establish that the defendants' reasons were a mere pretext. Indeed, I find it is not only a strained effort, but rather troubling because it does not comport with my understanding of the evidence.[4]

Barbara Sirota was hired in 1967 or 1968 at the same time as two male assistant professors. The claimant contends that though they all appeared to have equal qualifications, Professor Sirota was paid less. It is true that her salary level was lower, but so were her qualifications; she did not have a Ph.D. degree, nor did she acquire one for the three years she was on the faculty.[5] Thus even if an isolated instance of discrimination against another individual were relevant here, the evidence fails to establish discrimination against Professor Sirota. As for Professor Hicks, the Court regrets that it cannot correlate this name with any of the notes it has. I must conclude that the defendants' comments stated in the brief are correct, i. e., "The English Department has never employed a faculty member by the name of Hicks."

As to the statistical evidence relied on by the claimant, it must be evaluated within the teachings of *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1976), wherein the Court stated, quoting from *Teamsters v. United States*, 431 U.S. 324, 340 n.20, 97 S.Ct. 1843, 1857, 52 L.Ed.2d 396,

> absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of longlasting and gross disparity between the com-

---

3. Exhibits 14, 15 and 16.

4. This Court has not had the benefit of a transcript. Though it has confidence in the notes that were taken, it was not the easiest case to follow. The evidence was redundant and in many parts irrelevant. I realize there is a cost factor to consider in the trial of cases, but I urge counsel to at least consider ordering those parts of the record they deem especially important.

5. While these facts tend to indicate that in some cases Brown University may have determined salary levels according to academic qualifications, it fails to establish that this was a general practice or that the English Department's alleged deviation from any such practice in Professor Woods' case was discriminatory.

position of a work force and that of the general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population.

In commenting on the comparison made by the Court of Appeals, it said

The Court of Appeals was correct in the view that a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market.

*Hazelwood*, at 308, 309, 97 S.Ct. at 2742 (footnote omitted).

To begin with, I cannot find in the exhibits the "National Availability Pool" statistics. The defendants are correct in stating that the statistics are meaningless without evidence concerning availability pools for women faculty members in the various disciplines. It is true that certain charts introduced by the claimant show that for 1972–1973 a greater percentage of men were hired and promoted; however, the question remains whether these charts, alone or in conjunction with other evidence, are sufficient to constitute evidence of a pattern or practice of discrimination. I think not. Absent a standard for comparison, there is no evidence of a disparity from a relevant available pool. It must be established that there was a percentage deviation from such pool sufficient to make the hiring, promoting, and salary increase practices suspect. The charts, as introduced in this case, fail to do this. Furthermore, I also agree with the defendants that simply comparing the salaries of personnel in one department with those of another, as the chart does, tells us nothing unless we know whether the teachers had comparable qualifications and whether the different disciplines commanded like salaries. Furthermore, it proves little to isolate the position of creative writing—the record shows only that

one creative writer was hired though there were several positions open, without indicating how many women applied. Without ruling conclusively on the appropriateness of department-wide statistics in future appeals, I conclude that the statistical evidence here is insufficient to prove plaintiff's case.

The individual comparisons resorted to by plaintiff are similarly insufficient to prove that the defendants' articulated reasons are a mere pretext.[6] For example, claimant contends that a comparison of her starting salary with that of Professor Michael Silverman shows discrimination. As claimant points out, Professor Silverman was given a three year contract [compared to her contract for two years] at a higher salary despite the fact that he had less teaching experience than she did. The claimant fails to note, however, that Professor Silverman received his Ph.D. four years before claimant, that he was hired to develop a film studies program, and that she was paid more than he was in the subsequent four years.

The point is that the Court cannot be expected to scrutinize the relative weight of all the factors that go into the hiring process—*i. e.*, teaching experience as against practical experience, a film studies program as against another program, a three year contract as against a two year contract. It is the University's responsibility to balance the best interests of each department in allocating funds. Thus, in order for the complainant to prove discrimination, she must establish more than trivial differences in treatment that may very well be the result of differing needs of the department and differing economic factors for various disciplines.

Here, the complainant has failed to persuade me that her starting salary was the result of a discriminatory motive. Indeed, it cannot be denied that Professor Woods has fared very well. Her salary over the entire period at issue has been greater than

---

**6.** Claimant has made comparisons with Professors Geoffrey Russom, David Parker, Michael Silverman, and William Vanech.

or equal to the salaries of those professors she would have us compare.

*Conclusion*

I find that the plaintiff has failed to prove by a fair preponderance of the evidence that the reason articulated by the defendants is a mere pretext and that but for defendants' motive to discriminate against Professor Woods because of her sex, her salary would have been higher.

## APPENDIX

### CONSENT DECREE

Plaintiff filed her complaint on May 10, 1975, and her Amended Complaint on February 11, 1976, alleging that the Defendant Brown University and certain officers and individuals were engaged in employment discrimination based upon sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended. The Defendants have denied the allegations, and the matter was certified as a class action on July 21, 1976. This Court has jurisdiction of the parties and of the subject matter in this action.

This Decree, being issued with the consent of the Defendants, shall not constitute an adjudication or finding on the merits of the case, and shall in no manner be construed as an admission by the Defendants of any violation of said Title VII or of any similar Act. Rather, it is the intention of the parties to resolve this action and all issues raised by the Amended Complaint without the time and expense of contested litigation, and it is their objective by the entry of this Decree to correct previous injustices, if any, and to achieve on behalf of women full representativeness with respect to faculty employment at Brown University.

This Decree shall be binding upon the parties, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual or constructive notice of this Order, and it is hereby ORDERED and DECREED:

1. The University is permanently enjoined from discriminating against women on the basis of sex with respect to all terms and conditions of faculty employment, including recruitment, hiring, promotion, contract renewal and tenure.

2. The University is ordered to take the following affirmative steps:

(A) Develop and maintain goals and timetables in accordance with *Exhibit A.*

(B) Until the goals as set forth in *Exhibit A* are attained and full utilization of women faculty based on statistical availability as defined in *Exhibit A* is reached, apply affirmative action on behalf of women faculty in hiring, contract renewal, promotion, and tenure by giving preference to a female candidate of equal qualifications over non-minority males and follow the procedures established below.

(C) Will require each of its faculty Departments and Divisions to adopt and publish specific criteria, standards and procedures (the last to be as set forth in Exhibit B) for hiring, contract renewal, promotion to tenure and other promotions, except with regard to the criteria for promotion from Associate Professor to Full Professor, which criteria shall be as set forth in the Department Chairman's Handbook. In specifying criteria for teaching, scholarship and university service and standards of excellence, each Department or Division shall identify changes, if any, from those in effect currently and during the recent past. The Departments and Divisions shall also describe the differences between tenurable and non-tenurable positions and shall note that movements between tracks, other than non-discretionary promotions, shall be processed as new hires.

The Departments' and Divisions' criteria and standards shall be detailed, clear, objective and fair, with the understanding that the objectives of these requirements are: to fully apprise faculty and prospective faculty of the criteria and standards by which the effectiveness of their performance is evaluated; and to enable the Dean of the Faculty and Academic Affairs and the Affirmative Action Monitoring Committee to

fulfill their prescribed review functions on an informed basis. Each Department and Division in articulating criteria and standards shall state the relative importance of each criterion and shall reasonably define and describe its proposed standards. The Dean of the Faculty and Academic Affairs shall use his or her best efforts to ensure that these requirements are met, and the Affirmative Action Monitoring Committee may, in reviewing submissions to it, require the Departments and Divisions to present clear and convincing evidence that these requirements have been met.

Not later than ninety (90) days following the entry of this Decree as a final judgment, the Departments and Divisions shall transmit their submissions under this paragraph to the Dean of Faculty and Academic Affairs for review. Upon being satisfied that the submissions are sufficient, as received or as modified or supplemented, the Dean shall transmit said submissions to the Affirmative Action Monitoring Committee for its review as to their sufficiency. The Committee may approve, and authorize implementation of, the submissions, or it may require a Department or Division to amplify its submission or satisfy the Committee by clear and convincing evidence that the submission is sufficient.

It is the intention of this Decree that the criteria, standards and procedures referred to herein shall be implemented at the earliest practicable date, but in no event may any Department or Division deny employment, contract renewal, tenure or other promotion to any person after June 30, 1978, except pursuant to approved criteria, standards and procedures. The Monitoring Committee may authorize exceptions to this date to avoid unfairness during the implementation period.

Either with respect to initial submission, or in the event that the University, or any Department or Division thereof, proposes to alter or amend the criteria, standards or procedures adopted pursuant to the preceding provisions and initially implemented following entry of this Decree, the University (or Department or Division) shall, upon request by a woman faculty member of that Department or Division or upon request by any member of the Affirmative Action Monitoring Committee, demonstrate to the Committee by clear and convincing evidence that such initial submission or proposed change is fair and nondiscriminatory as to sex.

It is the further intention of this Decree that the Departments' and Divisions' criteria, standards and procedures promulgated hereunder shall be applied by them consistently and uniformly. It is understood, however, that the Departments and Divisions may allow for exceptional situations for the future which would permit the change of weighting of the criteria. All faculty should be kept apprised as far in advance as possible of changes in Departmental or Divisional needs or other academic factors which may necessitate such exceptions. If it is claimed that such an exception is to the disadvantage of a woman faculty member, the Department or Division must satisfy the Affirmative Action Monitoring Committee by clear and convincing evidence either that the application was consistent and uniform or that the departure from consistency and uniformity was justified by bona fide academic considerations and was fair and nondiscriminatory as to sex.

(D) Maintain a procedure for annual reviews of all full-time untenured faculty by departments in accordance with *Exhibit C.*

(E) Develop and maintain a review procedure whereby all decisions concerning hiring, contract renewal, promotion and tenure are subject to review by a review body and by the President in accordance with *Exhibit D* to determine whether the procedures used were applied in a proper nondiscriminatory manner and whether the decision was proper on its merits. In the event that a departmental decision on contract renewal, promotion or tenure that is to be reviewed was arrived at by a Department or Division which does not include tenured women, then at the option of a woman candidate, the Dean of the Faculty and Academic Affairs and the candidate will select a Brown University Faculty woman

knowledgeable or expert in a cognate field or fields of the candidate, or absent the availability of such a Brown woman, such a non-Brown person, who shall evaluate the candidate's qualifications and advise the Committee on Reappointment and Tenure and the President during the course of its review of the Department's (or Division's) Decision.

(F) Will do the following with respect to hiring, contract renewal, promotion, and tenure:

(1) With respect to hiring, in the event that a male candidate is given a position in preference to a woman, the Department or Division hiring for that position will have the burden of proving to the Dean of the Faculty and Academic Affairs and to the Monitoring Committee by clear and convincing evidence that the procedure was non-discriminatory as to sex, that the search procedures described in Exhibit E were complied with, and that the male candidate selected, if not a minority, is better qualified than any woman candidate for the position.

(2) With respect to contract renewal, promotion and tenure, in the event that a woman candidate is not recommended for contract renewal, for promotion or to tenure, the Department or Division involved in not recommending will have the burden of proving to the Monitoring Committee (if the decision is not reversed by the President) by clear and convincing evidence that the refusal to recommend was nondiscriminatory as to sex and that the criteria developed according to the provisions of paragraph (C) hereof were applied. In the event that a nonminority male candidate in any Department or Division is given a contract renewal or a promotion to tenure and at the same time any woman (or women) similarly situated and considered in that Department or Division is not recommended for a contract renewal or for promotion to tenure, the Department or Division will have the burden of proving to the Dean of the Faculty and Academic Affairs and the Monitoring Committee by clear and convincing evidence that there was no dis-

crimination as to sex and that the male candidate, if not a minority, is better qualified than the woman (or women).

(3) In the event that the Committee on Faculty Appointment and Tenure (or the President) shall reverse on the merits any decision which is in favor of a woman candidate of any Department or Division (or of the Committee), the Committee (or the President) shall have the same burden of proof before the Monitoring Committee as hereinabove set forth in paragraphs (1) and (2).

(4) In the event that a faculty position is not filled after the prescribed search procedure, and if a female applicant for the position or a member of the Monitoring Committee questions whether the decision not to hire was or may have been discriminatory, the Department or Division, or other University official or body responsible for the decision, shall demonstrate to the Affirmative Action Monitoring Committee by clear and convincing evidence that the decision not to fill the position was nondiscriminatory as to sex and that the search procedures described in Exhibit E were complied with.

(5) The Monitoring Committee review procedures provided for herein may be initiated at the request of the woman faculty member or prospective woman faculty member involved within sixty (60) days after the final decision was known or after she should have had knowledge of the same, or by any member of the Monitoring Committee.

(G) Will provide to every woman faculty member with regard to all other future faculty employment decisions, including future employment practices, a grievance procedure whereby any claim of sex discrimination based on the terms and conditions of employment that does not concern hiring, contract renewal, promotion or tenure as referred to in Paragraph (F) shall be presented initially to the Dean of the Faculty and Academic Affairs for conciliation. If this is unsuccessful, the grievant may petition to the Monitoring Committee for consideration of the claim and for decision thereon.

In all grievance procedures and reviews of decisions provided in this paragraph and elsewhere in this Decree, grievants shall have access to all information reasonably necessary to prosecute their grievances, and any disagreements concerning material to be made available under this provision shall be resolved by the Monitoring Committee.

(H) Permit any faculty member, upon written request to the Dean of the Faculty and Academic Affairs, to obtain comparative salary information concerning both male and female faculty members of comparable rank and service within that person's disciplinary area within the University.

(I) Make available, upon request, all employment recommendations by a department concerning hiring, contract renewal, promotion and tenure to all Department or Division members. Unsuccessful applicants for a faculty position may, upon request to the University EEO Officer, inspect the Department's (Division's) Compliance Report which shall state the grounds for its selection of the candidate chosen, together with that person's curriculum vitae. Any faculty member will have access to all files maintained by the University, Department (Division) or Chairperson directly concerning that faculty member only, except with regard to any confidential letters of recommendation.

(J) Although nothing in this Decree is intended to require the creation or maintenance of faculty positions, it is the intention of the Decree that the University's present and future Staffing Plans will be implemented and designed so as to give full effect to the Goals and Timetables established herein (Exhibit A).

Staffing Plans will be submitted to the Affirmative Action Monitoring Committee by July 1 of each year and shall project faculty composition as indicated for at least two academic years.

If it appears or is claimed that a proposed change in the Staffing Plans will adversely affect a woman faculty member directly, upon her request or that of any member of the Monitoring Committee, the Dean of the Faculty and Academic Affairs on his designee shall demonstrate to the Committee, by clear and convincing evidence, that the proposed change was based upon justifiable academic or budgetary reasons and was nondiscriminatory as to sex. If it appears that any modifications or revisions of Staffing Plans have the projected effect of changing the goals and timetables set forth herein, upon request by any member of the Monitoring Committee, the Dean of the Faculty and Academic Affairs or his designee shall demonstrate to the Committee by clear and convincing evidence that the proposed change was based upon justifiable academic or budgetary reasons and was non-discriminatory as to sex.

Not later than ninety (90) days after the entry of this Decree as a final judgment, the Dean of the Faculty and Academic Affairs or his designee shall submit to the Monitoring Committee a written statement of the criteria employed in designing and amending Staffing Plans and the factors and circumstances of exceptions, if any, permitted to Staffing Plans.

(K) The University and its Departments (Divisions) shall maintain all records relevant to recruitment and hiring for a period of no less than 3 years. Records relevant to promotion, tenure, and terms and conditions of faculty employment shall be kept for a period of no less than 7 years. The Monitoring Committee shall from time to time consider and designate such records as it finds should be kept for less than or in excess of these periods.

(L) There shall be established an Affirmative Action Monitoring Committee which shall be charged with the implementation of this Decree, the enforcement of this Decree, the hearing of any complaints as to violation of this Decree, and to act as a review body wherever described and required within the provisions of this Decree.

The Affirmative Action Monitoring Committee shall consist of five members, two of whom shall be selected by the Plaintiff and two of whom shall be elected by the voting faculty of the University. These members

shall be tenured faculty of the University, except that one of the members chosen by the Plaintiff may be from the nontenured regular faculty. The fifth member of the Committee shall be selected from the tenured faculty of the University by the members selected by the Plaintiff and elected by the faculty. If these four members are unable to agree upon the fifth member, the Court will select the fifth member from a list of six tenured faculty nominees, three of whom shall be designated by the Plaintiff and three of whom shall be designated by the University.

There shall also be four alternate members of the Committee who shall be selected as above, i. e., two tenured faculty members selected by the Plaintiff and two tenured faculty members elected by the voting faculty of the University; provided, however, that one of the alternate members selected by Plaintiff may be a nontenured regular faculty member if both of the regular members selected by Plaintiff are tenured faculty members. These alternate members shall participate in the decisions of the Committee only in the event that a Plaintiff's regular member or a University's regular member resigns or is unavailable or ineligible * with respect to a specific question or issue or for a particular period of time.

The regular members of the Committee and their alternatives shall serve for a term of three years. The University's successor members and alternates shall be elected by a faculty vote as provided above and the successor fifth member shall be selected as provided above. The Plaintiff's successor members and alternates shall be selected at the end of the first three-year term by a panel of three tenured faculty persons at the University who shall be nominated by the Plaintiff within ninety (90) days from the entry of this Decree as a final judgment. This panel shall in turn elect its successor panel at the end of the first three-year term after making its selection of the

two regular members of the Committee and their two alternates as hereinabove described, and successor panels shall so function for the purpose of selecting Committee members and alternates, and for the purpose of designating their own successors. The Monitoring Committee and this panel shall be constituted no later than ninety (90) days from the entry of this Decree as a final judgment.

The duties of the Committee shall be to oversee the general supervision and compliance by the Defendant of the various provisions and exhibits of this Consent Decree. In addition, the Committee shall make decisions where required and shall act as a review body where specifically required under the terms of this Decree. Further, in the event that any woman is dissatisfied with a decision of the Committee which directly affects her, she may seek de novo consideration by appropriate motion to the Court. Likewise, de novo judicial consideration of Committee decisions with respect to implementation or compliance with the provisions of this Decree may be initiated by any class member. The University may also seek de novo consideration of any decision of the Committee by appropriate motion to the Court. In hearing such motion, the Court will apply the same burden of proof as required before the Monitoring Committee. Motions with respect to final decisions of the Committee shall be filed no later than thirty (30) days from receipt of notice of the decision.

The Committee may establish its own internal procedures for disposition of the various duties and responsibilities which may arise before it. It may conciliate, conduct hearings, obtain such documents as it may deem necessary, and hear witnesses. It may appoint sub-committees, which may include the alternate members, in accordance with its own procedures to aid or assist it in the implementation and enforcement of the Decree, provided, however, that it shall not delegate any duties and responsibilities

---

* The Committee shall establish its own rules with respect to eligibility. For example, a Committee member may be ineligible because of a conflict of interest or because nontenured faculty members do not participate in tenure decisions or reviews.

where it is required to act as a review body. Upon reasonable notice Plaintiff's counsel shall have access to documents filed with the Monitoring Committee. The Committee will prepare reports from time to time which will set forth its activities regarding the implementation and enforcement of this Decree, its disposition of complaints, its evaluation of the achievements of the goals, timetables and affirmative action requirements of the Decree; its reports shall be distributed at least to the plaintiff or her designee, plaintiff's counsel, the President or his designee, the Defendants' counsel, and the Court. But in all events, an annual report shall be filed with the Court by October 1 of each year as well as with all parties designated herein.

The Committee shall have a fully adequate staff and resources paid for by the University to meet its duties and responsibilities.

(M) Plan for Redress for Class Members who may have been discriminated against in hiring, contract renewal, promotion, tenure and other terms and conditions of employment:

(1) Notice of the proposed settlement will be sent to all class members as set forth in paragraph (4) below, including women who, since February 2, 1974, were denied tenure, contract renewal, promotion or were denied employment in departments where males were hired instead of women.

(2) The procedure for hearing claims of discrimination on the basis of sex among those women receiving notice of this Decree:

(a) Any person in those categories who believes that she was treated discriminatorily based on sex shall within thirty (30) days after receiving notice by mail or forty-five (45) days after the last publication thereof, whichever is later, advise the University's EEO office to that effect and that she desires to avail herself of the benefits of the Decree;

(b) The University shall advise her that she must, within sixty (60) days thereafter, present all relevant facts of her claim, together with appropriate documentation,

to a Hearing Panel of three Brown University tenured faculty persons who shall be chosen one by the Plaintiff, one by the University, and the third by the first two, or in the event of disagreement, by the Court from a list of six tenured faculty, three to be recommended by each party;

(c) The Hearing Panel shall receive, and make an appropriate record of, the claimant's information. It may call upon the relevant academic Department or other appropriate sources for such other information as will enable it to determine whether: one, in the case of hiring, the claimant was the most qualified of all claimants for the position; and, two, in the case of hiring or any other adverse decision or term and condition of employment, whether there are reasonable grounds to believe that there was discrimination on account of sex, either procedurally or substantively. The claimant or her counsel will be given reasonable access to all information reasonably necessary to present the claims.

(d) The Hearing Panel shall consider the claim or claims promptly and no later than 120 days from the last date permitted for claimants to present claims, report to the claimant, the University and counsel for the Plaintiff its conclusion (whether unanimous or divided) and recommendations, together with statements of reasons therefor, as to whether there are reasonable grounds to believe discrimination occurred, and, in the case of hiring, whether she was the most qualified of all claimants for the position.

(e) The Hearing Panel may also attempt to settle or informally dispose of any claim or claims. If more than one claim is made for the same position within a Department, the Hearing Panel will make a recommendation as to the Claimant(s) more (most) qualified for the position in order to determine the claimant entitled to damages, if any.

(f) If the Hearing Panel finds reasonable grounds to believe that discrimination in hiring, contract renewal, promotion, tenure and other terms and conditions of

employment occurred, and, in the case of any female applicant where a male was hired, that the female applicant was the most qualified of all claimants before the Hearing Panel, the Hearing Panel shall consider the claim further to determine the amount of financial loss to the claimant as backpay due and owing to her, if any. This determination shall include consideration of the loss of earnings of the claimant because of the possible discrimination by comparing the claimant's actual earnings with those which would have been earned by her had discrimination not occurred. The burden will be upon the claimant to establish by the preponderance of evidence the amount of any claim, that she sought or held other employment during the entire period of loss of income or backpay claimed, or that she was available for work. In no event shall any monies paid to any claimant exceed the salary which would have been paid to her by Brown University, from the period of February 2, 1974, to July 1, 1978, or from the end of the time of her last pay period after leaving Brown University to July 1, 1978 (or in the case of an applicant, from the date the position sought would have commenced), whichever is the least.

The University shall establish a fund of $400,000 for payment of damages to claimants under paragraph 2(M). The University shall not pay damages in excess of this amount. In the event that the total amount of damages to all claimants when aggregated exceeds this amount, then each claimant will have her amount of damages pro-rated, but in no event shall the University pay damages in excess of this amount. Appeal may be had by any claimant to the Court, but no award of the Court shall exceed the pro-rated damages in the event the total awards exceed $400,000. Upon establishment of the pool, and the payment of claims due thereunder, all claimants shall be barred from any and all claims of discrimination on the basis of sex occurring prior to the entry of this Decree against all of the Defendants and any faculty member at Brown University.

(g) Subject to the limitations of the total award to be made under Paragraph M(2)(f), in the event the University appeals from the decision or report of the Hearing Panel and the claimant continues to suffer a loss of earnings, the University shall pay the additional financial loss, until a final decision is reached or until July 1, 1978, whichever is earlier. In the event the claimant appeals from the decision or report of the Hearing Panel, the claimant will not be awarded additional damages for loss of pay, if any, incurred after the date of the decision or report of the Hearing Panel.

(h) If dissatisfied with the report or recommendation of the Hearing Panel, the claimant or the University may petition the Court for a de novo hearing on all the issues.

(3) In addition to any damages provided as remedy hereinabove, any female claimant who has been found to be the most qualified person for a particular vacancy which was filled instead by *the hiring* of a non-minority male after June, 1975 shall be given a preference in the hiring to fill a suitable vacancy occurring hereafter in the relevant Department if that person is at least equally qualified to the most qualified non-minority applicant for the position.

3. The Plaintiffs and their attorneys agree to within thirty (30) days after termination of all proceedings under paragraph 2(M) return to the Defendant University all documents, tapes, and copies thereof which have been supplied to them or made by them or by their attorneys pursuant to the discovery process in this matter with the exception of copies of the Departmental personnel file of Dr. Lamphere, Dr. Carey, Dr. Cserr and Ms. Russian if requested and itemized. The Defendant University agrees to store all returned documents, tapes and copies thereof in a secure place in order that the same may be referred to from time to time by the Court or the plaintiff's attorneys pursuant to the monitoring process described herein. In the event the University proposes or intends to destroy any ma-

terials referred to herein, such destruction or discarding shall not take place except after thirty (30) days notice to the plaintiff's attorney to enable them to object to such proposed destruction or discarding to the Defendant's attorneys, or the Court, or both.

4. Upon agreement to this Decree by the parties, it shall be submitted forthwith to the Court for its approval. In the event of approval by the Court, written notice of the terms of this compromise shall be given to all those class members by first-class mail whose names and addresses are known and to others by appropriate publication to be agreed upon by the parties. If there shall be no objection to the Decree made within thirty (30) days of the date of the last mailing or publication, the Decree shall be entered as a final judgment. Timely objections to the Decree shall be heard and determined as promptly as feasible. In the event that any objection to the Decree is sustained wholly or in part or in the event of disapproval of the Decree by the Court wholly or in part, each of the parties reserves the right to trial of all issues. Provided, further, that none of the class benefits or obligations conferred or imposed by the terms of this Decree shall vest until the Decree shall become a final judgment, and none of the procedures provided to implement such class benefits and obligations will begin until the Decree is a final judgment, except that currently unidentified class member claimants, described in subparagraph 2(M) above, may advance their claims as provided therein.

5.(A) The claims of Drs. Lamphere, Carey and Cserr, arising out of or related to alleged sex discrimination, are resolved as follows:

1. Dr. Lamphere shall receive tenure effective July 1, 1974 in full satisfaction of all claims to the date hereof.

2. Dr. Carey shall receive tenure effective July 1, 1974 and shall receive the amount of $12,000 in full satisfaction of all claims to the date hereof.

3. Dr. Cserr shall receive tenure effective July 1, 1976, and shall receive the amount of $2,000 in full satisfaction of all claims to the date hereof.

(B) The claim of Ms. Patricia Russian, arising out of or related to alleged sex discrimination, is hereby resolved by the payment of $34,500 to her in full satisfaction of all claims to the date hereof.

(C) The Plaintiff and class members Cserr, Carey and Russian will each execute a revocation, cancellation, and withdrawal of the claims each has filed with the EEOC (or a conciliation agreement if the EEOC so requires) and the Rhode Island Commission for Human Rights, and shall cooperate with the Defendant University and other Defendants in any reasonable manner requested to bring about the closing of her administrative file with such Commissions, including the filing of any appropriate forms or releases. In addition, Ms. Russian, and Plaintiff Dr. Lamphere, Dr. Carey, and Dr. Cserr further agree that each will execute releases of all claims against all Defendants, and against all individuals named in any charges before any Commission from sex discrimination and/or growing out of or relating to sex discrimination, and as to all matters arising out of the grounds of the Plaintiff's Complaint and in the charges resulting therefrom, and will each execute all forms required by any such Commission including conciliation to accomplish the same.

(6) The provisions of this Decree shall apply to actions taken by the University with respect to the hospital-based faculty in the Division of Biology and Medicine, except that the University shall not be held responsible for any action or decision of any affiliated hospital beyond the extent to which the University participated in such action or decision.

The provisions of this Decree shall be effective as to such hospital-based faculty (who currently report to the Dean of Medicine) only to the extent that such hospital-based faculty, acting as agents of the University, participate in any activity of the Division or the University which relates to hiring, contract renewal, promotion, tenure and conditions of employment with regard

to the campus-based and hospital-based faculty of the Division or the University.

It is not the intention of this Decree, however, to include either directly or indirectly the activities of any hospital employer of any hospital-based medical faculty nor the actions of any such faculty except as hereinabove described, nor is it intended that the University shall have any other obligations other than those set forth above under this Decree, except to communicate to the hospitals any decisions reached as a result of such on-campus University activity as hereinabove described in order that the hospitals will have notice of such decisions.

(7) *Dissemination of Decree*: Copies of this Decree shall be disseminated to all women faculty, to the tenured faculty and to all other faculty members upon request.

In addition, upon an applicant's first communication with the University by filing an application for employment upon its faculty for a duly advertised and existing faculty position, the applicant shall be notified that the University operates under a Consent Decree and providing for the hiring of women faculty in accordance with certain goals and timetables; and that if the applicant would like further information, he or he should contact the EEO officer.

(8) The University agrees to pay the reasonable attorneys' fees incurred by the Plaintiff and class members in this action up to the date of entry of final judgment together with costs and disbursements. The parties reserve all claims and defenses, including appellate rights, with respect to the amounts of reasonable attorneys' fees, costs, and disbursements. The parties reserve all claims and defenses, including appellate rights, with respect to attorneys' fees, costs, and disbursements after entry of final judgment in this action.

Assented to as to
form and substance:

/s/ Louise Lamphere,
Plaintiff and class
representative

/s/ Milton Stanzler
/s/ Jordan Stanzler
Attorneys for Plaintiff,
Louise Lamphere, and the
Class

BROWN UNIVERSITY IN PROVIDENCE IN THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, Defendant

By /s/ Howard R. Swearer,
President (to be ratified
by the Corporation)

/s/ DeWitte T. Kersh, Jr.
/s/ J. Harold Flannery
/s/ Richard A. Sherman
Attorneys for Defendant,
Brown University

Dated: September 12, 1977

Enter Order: /s/ Raymond J. Pettine
Chief Judge

### GLOSSARY

#### Clear and Convincing Evidence

"Clear and convincing" evidence as used herein shall indicate an amount of evidence which is less than "beyond a reasonable doubt", but more than "a preponderance of the credible evidence."

#### Regular Faculty and Nonregular Faculty

For the purposes of this Decree, regular faculty are defined as those faculty who have one of the following titles: Professor, Associate Professor, Assistant Professor, Instructor, or Lecturer (half-time or more). Nonregular faculty are defined as those faculty who have the designation of "Adjunct," "Visiting," or "(Research)" or who have the title of Lecturer (less than half-time). Hospital-based and "Clinical" faculty members in the Division of Biology and Medicine are not considered to be regular or nonregular faculty.

### EXHIBIT A

### GOALS AND TIMETABLES

1. There are hereby established, and set forth below, goals and timetables describing

the number of women who it is expected will be members of the tenured and nontenured regular faculty at Defendant Brown University in the future. These goals are delineated by areas of related academic disciplines, as they now exist at the University and as, it is assumed, they will exist in the future; and represent an attempt to attain a faculty composition by sex which is based on full utilization of qualified women, as measured by their availability.

2. The purpose of the Goals and Timetables herein described is to provide a measure of the extent to which the affirmative action procedures elaborated elsewhere are operating effectively.

3. The effectiveness of affirmative action procedures can be measured in part by the time within which they succeed in achieving and maintaining a situation where the proportion of women in tenured and untenured positions on the Brown faculty reflects the proportion of women in the appropriate pool of available PhD's.

4. Full utilization in any given year should be the expected composition by sex of tenured and nontenured regular faculty positions in that year as measured by availability of men and women recipients of PhD degrees in the various disciplines and subdisciplines represented by departments or programs at the University.

5. The appropriate availability pool for any given position depends on whether the position under consideration is tenured or nontenured.

    a. For a nontenured position the appropriate availability pool shall consist of all PhD recipients in the appropriate disciplines and subdisciplines for the six years prior to the year such position is filled.

    b. For a tenured position the appropriate availability pool shall consist of all PhD recipients in the appropriate disciplines and subdisciplines for the pertinent period of time (as further described in Exhibit A1) prior to the year such position is filled.

6. The proportion of women in the relevant availability pools for the purposes of this Decree at this time is estimated through use of the PhD recipient data provided by the National Center for Educational Statistics and the National Research Council for the disciplines and subdisciplines represented by departments and programs at the University. The indexes of availability, the sources thereof, and the method by which they were derived are indicated in Exhibit A1.

6a. The Goals and Timetables are as follows:

| Tenured Women: | 1979 | 1983 | 1987 |
|---|---|---|---|
| Humanities | 13.5 | 22.3 | 30.7 |
| Social Sciences | 3.3 | 7.1 | 10.7 |
| Physical Sciences | 3.3 | 4.6 | 6.0 |
| Life Sciences | 5.3 | 8.7 | 9.6 |
| Total | 25.4 | 42.7 | 57.0 |

| Nontenured Women: | 1979 | 1983 | 1987 |
|---|---|---|---|
| Humanities | 24.2 | 23.2 | 24.7 |
| Social Sciences | 8.4 | 7.7 | 7.5 |
| Physical Sciences | 2.2 | 2.6 | 2.0 |
| Life Sciences | 7.9 | 6.2 | 6.5 |
| Total | 42.7 | 39.7 | 40.7 |

In calculating these goals and timetables, it has been assumed that the attrition rate of male tenured faculty for reasons other than retirement will continue to be as great as it has been in previous years. It has also been assumed that the attrition rate of female tenured faculty will be zero.

7. The Staffing Plan indicates the current and anticipated number of faculty positions by department, division, program and subdiscipline for tenured and nontenured regular faculty at the University. Since the Staffing Plan is subject to modification from time to time due to various factors, the Plan as modified and revised, along with a report of the actual faculty staffing, will be filed with the Monitoring Committee by July 1 of each year and shall project faculty composition as indicated above for at least two academic years. In the event that any such modifications or revisions have the projected effect of changing the goals and timetables herein, set forth below, the provisions of Paragraph

2(J) of this Decree shall apply. In the event the staffing plan provides for an increase in the number of faculty positions, above that which is presently projected, the Goals and Timetables will be adjusted to reflect such increase, in accordance with the appropriate availability pools as indicated in Exhibit A1.

8. The University will also supply to the Monitoring Committee a copy of any relevant new data sources concerning PhD recipients and/or other relevant availability pool data and a copy of any revised faculty utilization analysis affecting the goals and/or timetables. It is anticipated, therefore, that goals and timetables set forth below will be updated, on a bi-annual basis beginning with the academic year 1981–82, in accordance with the principles for establishing goals and timetables, indicated above, as well as in accordance with the new data.

9. Although goals and timetables have been prescribed by areas and not by Departments or Divisions, Departments or Divisions which do not employ women shall henceforth, in filling positions, make special efforts, i. e., means particularly calculated to employ women faculty, to do so at the nontenured level by not later than 1983 and at the tenured level by not later than 1990, taking into account the size of the Department or Division and the appropriate availability pools in the relevant disciplines or subdisciplines.

If a Department or Division fails to employ women as provided in the preceding paragraph, it must demonstrate to the Dean of Faculty and Academic Affairs and to the Monitoring Committee by clear and convicting evidence that it has used appropriate special efforts throughout the period in question. Provided further that, if this burden of proof is not met before the Committee, the Department or Division shall not be permitted to fill any nontenured position beyond 1983 and any tenured position beyond 1990 unless and until this burden of proof has been met.

10. In the event that the University fails to attain the goals and timetables, the burden of proof is on the University to demonstrate that it has made good faith efforts throughout the period in question to attain the goals and timetables and that no discrimination has occurred.

11. In the event that the parties cannot agree upon updated goals and timetables, as provided in paragraph 8, updated goals and timetables will be determined by the Monitoring Committee, or the Court, in accordance with the principles established by this Exhibit.

12. In addition to the nondiscrimination provisions of this Decree, the affirmative action principles adopted herein, including particularly full utilization of women, shall apply to all salaried nonregular faculty. Except for visiting professors, adjunct professors and part-time faculty employed less than one-half time, the proportion of women on the salaried nonregular faculty shall be no less than the proportion in the relevant PhD availability pools, if ascertainable, as defined in this Exhibit.

## EXHIBIT A1

I. The sources of Ph.D recipient data used to determine the indexes of availability set forth below are:

A. NCES:

1. *Earned Degrees Conferred*, U. S. Office of Education, now National Center for Education Statistics (NCES), annually since 1947–48; including "Women's Representation Among Recipients of Doctor's and First-Professional Degrees", 1970–71 through 1974–75, NCES 76–022, 1976.

B. DRF:

1. *Doctorate Production in United States Universities, 1920–1962*, National Academy of Sciences—National Research Council, Publication 1142, Washington, 1963.

2. *Doctorate Recipients from United States Universities, 1958–1966*, National Academy of Sciences—National Research Council, Publication 1489, Washington, 1967.

3. Summary Reports for 1967 through 1976, *Doctorate Recipients from United States Universities*, National Academy of Sciences—National Research Council, Washington, various years.

C. Summaries of data from the Doctorate Record File, Commission on Human Resources, National Research Council, as contained in "Professional Women and Minorities", Scientific Manpower Commission, May, 1975, as supplemented through July, 1977.

At this time NCES data are available only through the year 1974–75 and DRF data are available only through the year 1975–76. 1975–76 NCES data have been estimated on the basis of 1975–76 DRF data. For 1976–77 and beyond, projections on the basis of best fit of estimating equations fitted to the data from 1970–71 through 1975–76 were used.

II. The method by which the indexes of availability were derived is as follows. First, for each department/division/program, the subuniverses of doctorates should reflect, as much as possible, the specific composition of the subfields in each department/division/program. The subfields actually employed in defining the disciplines are as follows:

Art: NCES: Fine Arts (general, Art, Art History and Appreciation)

Classics: NCES: Classics, Latin, Classical Greek

Comparative Literature: NCES: Comparative Literature, Modern Languages and Literature

English: NCES: General English, English Literature, Creative Writing, Dramatic Arts

French Studies: NCES: French Language and Literature, Philology

German: NCES: German Language and Literature, Philology

Linguistics: NCES: Linguistics

Slavic Languages: NCES: Russian, Slavic Language (other than Russian)

Hispanic & Italian Studies: NCES: Spanish, Italian, Philology (Romance Languages)

Music: NCES: Music (Performing, Composition, Theory), Music-Liberal Arts Program, Music History and Appreciation

Philosophy: NCES: Philosophy (excludes Scholastic Philosophy)

Religious Studies: NCES: Religious Studies, Religion-Liberal Arts (exclude Theology, Religious Education, Bible)

Anthropology: NCES: Anthropology

Economics: NCES: Economics

Education: DRF: Foundations—Social and Philosophic, Educational Psychology, Secondary Education, Educational Measurement and Statistics, Curriculum and Instruction

History: NCES: History

Political Science: NCES: Political Science and Government, International Relations

Sociology: NCES: Sociology, Demography

Applied Mathematics: DRF: Analysis and Functional Analysis, Mathematical Statistics and Probability, Computing Theory and Practice, Operations Research, and Applied Mathematics

Chemistry: NCES: Chemistry (General), Inorganic Chemistry, Organic Chemistry, Physical Chemistry, Analytical Chemistry

Engineering: NCES: Engineering (general), Aerospace, Aero- and Astro-Engineering, Bioengineering and Biomedical Engineering, Civil Engineering, Electrical and Electronic Engineering, Mechanical Engineering, Materials Engineering, Engineering Mechanics

Geological Sciences: NCES: Geology, Geochemistry, Geophysics and Seismology, Earth Sciences (general), Paleontology, Earth Sciences (other)

Mathematics: NCES: Mathematics (general), Statistics (Mathematical and Theoretical)

Physics: NCES: Physics (general), Molecular, Nuclear, Astrophysics

Biology: NCES: All Biological Sciences except Botany (general)

Medicine: DRF: Basic Medical Sciences (Biochemistry, Biophysics, Anatomy,

Cytology, Embryology, Immunology, Microbiology and Bacteriology, Molecular Biology, and Animal Physiology), Pharmacology, Pathology

Psychology: NCES: Psychology (general), Experimental Psychology, Social Psychology, Psychometrics, Developmental Psychology, Physiological Psychology

Portuguese & Brazilian: NCES: (Hispanic, Italian and Portuguese)

III. The index of availability for a given year in a particular discipline is the proportion of women among the Ph.D recipients in that discipline within a specific period of time preceding the given year.

A. The specific period of time for the index of availability for the untenured positions is considered to be the six years prior to the given year. The specific periods actually used are:

> For 1979: 1972–73 through 1977–78.
> For 1983: 1976–77 through 1981–82.

Separate indexes of availability for untenured women for 1987 have not been calculated at this time. For the purposes of determining the goals for untenured women in 1987, as set forth in Exhibit A, the indexes of availability for untenured women for 1983 were used. The calculation of indexes of availability for untenured women in 1987 will be made by 1983 as part of the updating process set forth in paragraph 8 of Exhibit A.

B. The specific period of time for the indexes of availability for tenured positions is considered to end six years prior to the given year. The beginning of the period is determined by assuming that the model age at which the doctorate is earned is 28 years and that the age of retirement is 65. Because of certain restrictions as to the availability of Ph.D recipient data sources, the actual beginning dates used in the calculation of the indexes set forth varied. The specific periods actually used are:

> For 1979: NCES: 1948–1972
> DRF: 1942–1972

For 1983: NCES: 1948–1976
DRF: 1946–1976
For 1987: NCES: 1948–1980
DRF: 1946–1980

IV. The indexes of availability by percentage (resulting from the methodology set forth above) for tenured women regular faculty for the years 1979, 1983, and 1987 are as follows *:

| A. HUMANITIES | 1979 | 1983 | 1987 |
|---|---|---|---|
| Art | 27.94 | 37.20 | 40.45 |
| Classics | 24.05 | 27.16 | 30.95 |
| Comparative Lit. | 32.41 | 37.97 | 41.98 |
| English (Theater Arts) | 24.60 | 28.25 | 31.11 |
| French Studies | 36.44 | 42.57 | 47.62 |
| German | 24.89 | 30.38 | 33.05 |
| Linguistics | 23.26 | 28.40 | 32.71 |
| Slavic Languages | 26.26 | 31.66 | 35.81 |
| Hispanic & Italian | 30.96 | 33.37 | 34.94 |
| Music | 14.08 | 16.48 | 18.22 |
| Philosophy | 10.25 | 11.87 | 13.25 |
| Religious Studies | 5.44 | 7.02 | 8.35 |
| Weighted Average Index ** | 23.8 | 28.0 | 30.5 |
| B. SOCIAL SCIENCES | | | |
| Anthropology | 22.37 | 27.09 | 30.02 |
| Economics | 5.82 | 6.55 | 7.20 |
| Education | 23.74 | 27.29 | 30.42 |
| History | 11.86 | 13.67 | 15.44 |
| Political Science | 8.87 | 10.52 | 11.74 |
| Sociology | 17.15 | 20.73 | 23.49 |
| Weighted Average Index | 12.4 | 15.3 | 17.6 |
| C. PHYSICAL SCIENCES | | | |
| Applied Mathematics | 4.87 | 5.62 | 6.37 |
| Chemistry | 6.32 | 7.07 | 7.77 |
| Engineering | 0.38 | 0.68 | 0.98 |
| Geological Sciences | 2.67 | 3.16 | 3.64 |
| Mathematics | 6.70 | 7.68 | 8.63 |
| Physics | 2.20 | 2.59 | 2.92 |
| Weighted Average Index | 3.4 | 4.2 | 4.6 |
| D. LIFE SCIENCES | | | |
| Biological Sciences | 13.93 | 15.80 | 17.32 |
| Medical Program | 15.71 | 17.48 | 18.95 |
| Psychology | 18.67 | 21.98 | 24.46 |
| Weighted Average Index | 16.0 | 17.8 | 20.3 |
| E. MISCELLANEOUS | | | |
| Portuguese & Brazilian | 31.0 | 33.4 | 34.9 |
| Total Weighted Average Index | 13.2 | 15.6 | 18.1 |

* The inclusion here of availability figures by disciplines is for the limited purpose of illustrating how availability data for areas were derived. The figures are not to be construed as departmental goals or any other measure of compliance with this Decree.

** In calculating the average for each area the availability index for each discipline was weighted by the number of faculty positions in that discipline.

V. The indexes of availability by percentage (resulting from the methodology set forth above) for nontenured women regular faculty for the years 1979 and 1983 are as follows *:

|  | | 1979 | 1983 |
|---|---|---|---|
| A. | HUMANITIES | | |
| | Art | 51.93 | 55.50 |
| | Classics | 42.12 | 52.21 |
| | Comparative Lit. | 49.52 | 53.68 |
| | English (Theater Arts) | 38.45 | 41.97 |
| | French Studies | 63.29 | 69.12 |
| | German | 46.22 | 51.25 |
| | Linguistics | 38.88 | 45.57 |
| | Slavic Languages | 42.23 | 47.64 |
| | Hispanic & Italian | 39.57 | 40.21 |
| | Music | 22.11 | 23.63 |
| | Philosophy | 16.30 | 18.36 |
| | Religious Studies | 7.66 | 13.45 |
| | Weighted Average Index ** | 37.5 | 41.9 |
| B. | SOCIAL SCIENCES | | |
| | Anthropology | 34.47 | 36.35 |
| | Economics | 8.86 | 9.69 |
| | Education | 35.11 | 38.61 |
| | History | 19.50 | 22.34 |
| | Political Science | 14.91 | 16.19 |
| | Sociology | 29.53 | 32.10 |
| | Weighted Average Index | 22.8 | 25.6 |
| C. | PHYSICAL SCIENCES | | |
| | Applied Mathematics | 8.29 | 9.36 |
| | Chemistry | 10.85 | 12.22 |
| | Engineering | 1.86 | 2.50 |
| | Geological Sciences | 5.26 | 5.99 |
| | Mathematics | 11.57 | 13.77 |
| | Physics | 4.33 | 5.07 |
| | Weighted Average Index | 6.7 | 8.2 |
| D. | LIFE SCIENCES | | |
| | Biological Sciences | 21.53 | 23.57 |
| | Medical Program | 22.76 | 24.60 |
| | Psychology | 30.55 | 32.41 |
| | Weighted Average Index | 25.1 | 25.4 |
| E. | MISCELLANEOUS | | |
| | Portuguese & Brazilian | 39.6 | 40.2 |
| | Total Weighted Average Index | 24.8 | 28.2 |

* The inclusion here of availability figures by disciplines is for the limited purpose of illustrating how availability data for areas were derived. The figures are not to be construed as departmental goals or any other measure of compliance with this Decree.

** In calculating the average for each area the availability index for each discipline was weighted by the number of faculty positions in that discipline.

## EXHIBIT B
### Teaching Evaluation

Each Department/Division shall develop and maintain general guidelines and requirements for the evaluation of faculty teaching for use in making decisions on contract renewal, promotion, and tenure. These guidelines and requirements shall set forth at a minimum:

1. Each Department/Division shall file with the Dean of the Faculty and Academic Affairs a description of the teaching activities to be considered in the evaluation of teaching and the methods used for that evaluation. Each Department/Division shall indicate in its description the expected level of effectiveness with respect to these teaching activities. The teaching evaluation methods shall be sufficiently comprehensive and systematic to provide a reliable measure of teaching throughout a Department/Division. Departmental/Divisional evaluation methods shall include effective mechanisms for eliciting responses by students (including former students, if desired) to the teaching of individual faculty.

If a woman faculty member of a given Department/Division or a member of the Monitoring Committee claims that this Department's/Division's evaluation methods are not sufficiently comprehensive and systematic to provide a reliable measure of teaching throughout this Department/Division, and if the Monitoring Committee so finds, the Committee shall make such adjustments with respect to the claim as will remedy and prevent discrimination as to sex or other unfairness.

2. Standards shall be established by each Department/Division, to the extent possible, for measuring the teaching ability and performance of the faculty.

3. In developing guidelines and methods for teaching evaluation, consideration shall be given to the protection of the rights of both students and faculty.

The descriptions, guidelines and requirements for teaching evaluation of each Department/Division, and any revisions thereto, shall be based upon reasonable standards of fairness and objectivity, and shall be filed with the Dean of the Faculty and the

Monitoring Committee for approval. The Dean shall insure that promulgation thereof occurs within a reasonable time.

So long as any Department/Division does not have an approved method of teaching evaluation, it may not deny contract renewal, promotion, or tenure on the basis of an inadequate teaching record beginning with consideration taking place during the academic year 1978–79.

Each Department/Division shall review at least biennially the effectiveness and reliability of their evaluation process and shall submit their findings to the Dean of the Faculty and Academic Affairs for transmittal to the Monitoring Committee. In the event the Dean of the Faculty and Academic Affairs or the Monitoring Committee concludes that the evaluation process is ineffective and unreliable, then the Department/Division may be required to submit revisions and may be prohibited from denying contract renewal, promotion or tenure on the basis of an inadequate teaching record until such revised guidelines and requirements are approved.

## EXHIBIT B–1

### CONTRACT RENEWAL AND PROMOTIONS

Recommendations to renew or not to renew contracts, or to promote or not to promote are initiated by the faculty member's Department, Section or Program. All recommendations must be prepared and concluded in sufficient time to enable the University to notify formally the individual of its decision at least twelve months before the expiration of the term appointment, except that for individuals whose term appointments total three years or less, notice shall be given at least eight months before the expiration of the appointment. Initial faculty appointments of one year or less duration, and visiting and adjunct appointments of whatever duration, are to be considered term appointments not requiring additional notice from the University of expiration.

At least one year before such a recommendation is made, taking into account the date of this Decree and a reasonable time as necessary to implement it, the faculty member has a right to (1) a written statement of the Department's (Division's) criteria for recommending a renewal of an appointment or promotion and the Department's (Division's) procedures in making such a recommendation; and (2) an explanation of the Department's (Division's) needs as far as these may affect his or her reappointment or promotion or potential tenure review. The faculty member also has the right to an explanation of what the recommendation is and to whom and when it will be sent. In the case of a negative recommendation, and at the request of the individual, he or she shall be given, in writing, the reasons of the Department (Division) for its decision. As outlined in the section concerning the Committee on Faculty Reappointment and Tenure, the individual also has the right to present written material in person and/or in writing to such Committee.

At a duly called meeting of the tenured (senior) faculty, the tenured (senior) members of the Department (Section) will review the candidate's performance with regard to scholarship, teaching and service, in accordance with the specific criteria established by the Department (Division) which are on file with the Dean of the Faculty and Academic Affairs. (Publications and teaching evaluations, as well as other pertinent parts of the Department (Section) file on the faculty member, will be available to tenured (senior) members of the Department (Section) two weeks before the meeting to make the recommendation.) On the basis of an evaluation of these aspects of an individual's performance, as well as a consideration of the Department's (Division's) staffing needs, a recommendation will be made in writing by the proper date and indicating the quorum the Department (Section) has established as necessary to make such decisions. The recommendation will contain a conscientious documentation by the Department (Section) of the candidate's professional career, as well as the reasons for the recommendation and the data used to arrive at the decision.

For faculty members in the Division of Biology and Medicine, the recommendation

of the Section regarding contract renewal will be submitted to the Executive Committee for acceptance, rejection, or modification. The Section's recommendation regarding promotion will be submitted to the Promotions Committee which will then make a recommendation to the Executive Committee for its acceptance, rejection or modification. At the request of the Executive Committee, the Dean of Biological Sciences or Dean of Medicine may solicit letters of reference from other members of the Division who may have some knowledge of the performance of the untenured faculty member being considered for contract renewal. If the Executive Committee rejects a positive recommendation of the Section, it shall provide a written explanation for such a decision at the request of the individual or the pertinent section.

The Executive Committee of the Division of Biology and Medicine will establish the quorum necessary for it to make contract renewal and promotion decisions.

### TENURE REVIEW

Any untenured member of the faculty who holds tenurable rank at Brown, and whose full-time service at Brown amounts to five years or more, must have a full tenure review before a Department or Division can make a recommendation for or against promotion to tenured rank. As stated above, the written criteria for evaluating scholarship, teaching, and service shall be spelled out as provided in paragraph 2(C) of this Decree and copies provided to the candidate, and to the Dean of the Faculty and Academic Affairs.

Before a recommendation is made for tenure, the untenured faculty member has the right to: (1) a written statement of the Department's (Division's) criteria for recommending tenure and the procedures used in making such recommendations; and (2) an explanation of the Department's (Division's) needs as far as these may affect his or her tenure. At the time of the recommendation, the candidate shall be notified

1. Refer to Section II for tenure procedures and recommendations in the Division of Biology and Medicine.

in writing of the recommendation and, in the case of a negative recommendation, of the number of votes for and against and the reasons for the Department's (Division's) decision. As outlined in the section concerning the Committee on Faculty Reappointments and Tenure, the individual also has the right to present written material in person and/or in writing to such Committee.

### I. THE TENURE PROCEDURES AND RECOMMENDATION IN THE DEPARTMENT [1]

A. Initial Department Procedure

1. No later than November 1 of the sixth year of the candidate's probationary period (assuming a probationary period of seven years), the Department Chairperson, in consultation with the candidate, shall select no less than a three person "tenure committee" to guide the evaluation procedure (the "tenure committee" shall be smaller if there are less than three tenured faculty within a Department). The Chairperson may or may not be a member of the "tenure committee" and the head of the committee may be a tenured person in the Department or the Department Chairperson.

2. As soon as the "tenure committee" has been selected, which is normally during the first week in November, the Department Chairperson will convene a meeting of all tenured faculty of the Department and outline the procedures to be used in the evaluation for tenure. Where a candidate for tenure holds a joint appointment, each Department, Section, or program shall have a separate tenure committee meeting and make separate evaluations and recommendations.

3. The "tenure committee", in consultation with the candidate, will be responsible for assembling the candidate's tenure dossier. This process should begin as soon after November 1 as possible. This dossier will ultimately carry the Department's recommendation on promotion to tenure, and will

be kept permanently in the files of the dean of the Faculty and Academic Affairs. It will contain the following:

a. an updated curriculum vitae;

b. a list of individuals outside the University who should be well acquainted with the candidate's field(s) of scholarship;

c. letters of reference, including the Department's letters of solicitation; and a statement of how each referee was chosen;

d. materials pertaining to the evaluation of the candidate's teaching performance and contributions to the curriculum, including summary tabulations of semesterly teaching evaluations;

e. records of the candidate's service to the University;

f. copies of all minutes of meetings and correspondence of the department, which bear upon the question of the candidate's promotion to tenured rank.

4. In addition, the "tenure committee" will assemble, in consultation with the candidate, a complete file of scholarly publications and material submitted for publication as supplied by candidate to be considered by the "tenure committee" and made available for reading to all tenured members of the Department. The "tenure committee" will also assemble a file of material on teaching performance gathered in accordance with the procedures outlined in its program for teaching evaluation filed with the Dean of the Faculty and Academic Affairs.

The "tenure committee" will make these materials available (publications and teaching evaluation materials) to the Committee on Faculty Reappointment and Tenure on request.

5. Not later than December 1 of the sixth year, the candidate shall supply the "tenure committee" with a list of outside individuals who are well acquainted with his or her scholarship. At the same time, the "tenure committee" may select other individuals who are acknowledged scholarly and/or educational leaders in the discipline from whom to seek confidential written comments on the quality of accomplishment of the individual under review. Before writing these individuals, the Chairperson of the "tenure committee" shall inform the candidate of the additional names, and the candidate may lodge such objections as he or she may have not later than December 15 of the sixth year. The "Tenure Committee" shall write to a number of persons suggested by the candidate, as well as those added by the "Tenure Committee", for confidential letters of reference. In consultation with the candidate, the Chairperson of the "tenure committee" shall decide on how many people will be asked to serve as referees. At least five letters should be received from individuals who are not on the Brown faculty.

6. A statement of the contents of the dossier (including the names of all referees but not the contents of their letters) shall be given to the candidate no later than February 1 of the sixth year, so that the candidate may complete or supplement it with additional material, if necessary.

7. The Department's recommendation shall not be made without a complete dossier for the candidate, unless the candidate fails to submit the required materials by February 15 of the sixth year.

8. Documented efforts must be made to secure the maximum participation of the tenured faculty of the Department, as required in the evaluation and recommendation process. The candidate's dossier shall be sent to those tenured faculty members in the Department not in residence not later than March 1 of the sixth year. Copies of any of the materials or publications held by the "tenure committee" shall be sent to such members on request. Those tenured faculty not in residence shall be requested to send written statements concerning the candidate to the Chairperson of the "tenure committee" no later than March 15 of the sixth year, but failure to receive statements from absent members shall not prevent completion of the evaluation and recommendation process.

B. Making the Recommendation: Department

1. The Department's recommendation, together with the reasons therefor, whether

positive or negative, shall be made and forwarded with the tenure dossier (listed in A. 3 above) to the Committee on Faculty Reappointment and Tenure no later than April 1 of the sixth year.

2. At a duly called meeting of the tenured faculty, the candidate's "tenure committee" will present the evidence on scholarship, teaching, and service. The tenured faculty will further discuss the evidence and take a vote which will be recorded and which will be the basis of the Department's recommendation to the Committee on Reappointment and Tenure. This recommendation shall be made in writing and indicate the quorum the Department has established as necessary to make such decisions.

3. The following documents shall be forwarded to the Committee on Faculty Reappointment and Tenure:

   a. the candidate's dossier (as specified in A. 3 a–f);

   b. the Department's recommendation, including reasons, and in the case of a negative recommendation the votes, signed by the Department Chairperson and the Chairperson of the "tenure committee";

   c. a certification by the "tenure committee" Chairperson that the Department's and University's standards and procedures for tenure review have been applied; or, if they have not, the reasons therefor and what different standards and procedures were used;

   d. a copy of any specific supplement of the Department to the University's standards and procedures for contract renewal and tenure not already on file in the Office of the Dean of the Faculty and Academic Affairs.

## II. THE TENURE PROCEDURES AND RECOMMENDATION IN THE DIVISION OF BIOLOGY AND MEDICINE

A. Initial Procedure

1. No later than November 1, the Section Chairperson will convene a meeting of all senior faculty of the Section and outline the procedures to be used in the evaluation for tenure. Where a candidate for tenure holds a joint appointment, each Department, Section or Program shall make separate evaluations and recommendations.

2. The Section Chairperson, in consultation with the candidate, will be responsible for initially assembling the candidate's tenure dossier. This process should begin as soon after November 1 as possible. This dossier will ultimately carry the Section's and Division's recommendation on promotion to tenure and will be kept permanently in the files of the Dean of the Faculty and Academic Affairs and the Dean of Biological Sciences. It will contain the following:

   a. an updated curriculum vitae;

   b. a list of individuals outside the University who should be well acquainted with the candidate's field(s) of scholarship;

   c. letters of reference, including the Division's letters of solicitation; and a statement of how each referee was chosen;

   d. materials pertaining to the evaluation of the candidate's teaching performance and contributions to the curriculum, including summary tabulations of semesterly teaching evaluations;

   e. records of the candidate's service to the University;

   f. copies of all minutes of meetings and correspondence of the Section and Division which bear upon the question of the candidate's promotion to tenured rank.

3. In addition, the Section Chairperson will assemble, in consultation with the candidate, a complete file of scholarly publications and material submitted for publication as supplied by the candidate. The Section Chairperson will also assemble a file of material on teaching performance gathered in accordance with the procedures outlined in the Division's program for teaching evaluation filed with the Dean of the Faculty and Academic Affairs.

The Section Chairperson will make a copy of these materials available (publications and teaching evaluation materials) to the Promotions Committee of the Division and, on request, to the Committee on Faculty Reappointment and Tenure.

4. Not later than December 1 of the sixth year, the candidate shall supply the Section Chairperson with a list of outside individuals who are well acquainted with his or her scholarship. At the same time, the Section Chairperson may select other individuals who are acknowledged scholarly and/or educational leaders in the discipline from whom to seek their confidential written comments on the quality of accomplishment of the individual under review.

5. The dossier described in A. 2 above will be submitted by the Section Chairperson to the promotions Committee of the Division. The Chairperson of the Promotions Committee shall inform the candidate of any individuals the Section Chairperson and/or Promotions Committee wish to add to the list of referees, and he or she may lodge any objections no later than December 15 of the sixth year. The Promotions Committee shall write to a number of persons suggested by the candidate, as well as those added by the Section and/or Promotions Committee, for confidential letters of reference. In consultation with the candidate, the Promotions Committee shall decide how many people will be asked to serve as referees. At least five letters should be received from individuals who are not on the Brown faculty.

6. The Promotions Committee shall provide the candidate with a statement of the contents of the dossier (including the names of all referees, but not the contents of their letters) no later than February 1 of the sixth year, so that the candidate may complete or supplement it with additional material, if necessary.

7. The recommendation of the Section and Promotions Committee shall not be made without a complete dossier of the candidate, unless the candidate fails to submit the required materials by February 15 of the sixth year.

8. The Promotions Committee shall submit copies of the assembled letters of reference to the Section in sufficient time, so that the Section's recommendation concerning the candidate's promotion to tenure can be considered by the Promotions Committee in preparing its own recommendation to the Executive Committee.

9. Documented efforts must be made to secure the maximum participation of the senior faculty of the Section, as required in the evaluation and recommendation process. The candidate's dossier, including the letters of reference assembled by the Promotions Committee, shall be sent to those senior faculty members in the Section not in residence no later than March 1 of the sixth year. Copies of any of the materials or publications held by the Section Chairperson shall be sent to such members on request. Those senior faculty not in residence shall be requested to send written statements concerning the candidate to the Section Chairperson no later than March 15 of the sixth year, but failure to receive statements from absent members shall not prevent completion of the evaluation and recommendation process.

B. Making a Recommendation: Promotions Committee

1. The tenure review of each candidate will be guided by a four person Promotions Committee selected by the Executive Committee from the senior faculty of the Division. This Promotions Committee shall insure that there is a fair and uniform administration of the tenure process for each individual under consideration for promotion to tenure that year. The Chairperson of the candidate's Section may not be a member of the Promotions Committee. As soon as possible after the beginning of the academic year, a meeting of the full Executive Committee shall be called to elect two senior faculty of the Division to serve on the Promotions Committee for all tenure candidates being considered that year. In consultation with the Dean of Biological Sciences, each candidate shall choose a senior member of the Division having knowledge

of his or her performance who shall consult in person with the Promotions Committee during its deliberations.

2. The Promotions Committee shall further insure that the Section has adhered to the procedures for tenure review as outlined in Section A. above and to the Division's criteria for scholarship, teaching and service on file with the Dean of the Faculty and Academic Affairs.

3. In consultation with the candidate, the Promotions Committee may solicit additional letters of reference evaluating the scholarship of the candidate.

4. The Promotions Committee recommendation, whether positive or negative, shall be made and forwarded along with the tenure dossier (listed in A.2 above and supplemented by the Section's recommendation) to the Executive Committee no later than April 1 of the sixth year.

C. Making a Recommendation: Executive Committee of the Division

1. At a duly called meeting of the Executive Committee, the Promotions Committee will present the candidate's evidence on scholarship, teaching, and service which it has assembled from the Section and other prescribed sources. The Executive Committee will further discuss the evidence and take a vote which will be recorded and which will be the basis of the Division's recommendation to the Committee on Faculty Reappointment and Tenure. This recommendation shall be made in writing and indicate the quorum the Division has established as necessary to make such decisions.

2. By April 15 of the sixth year, the following documents shall be forwarded to the Committee on Faculty Reappointment and Tenure:

a. the candidate's dossier (as specified in A.2) as supplemented by any material used to arrive at its decision;

b. the Division's recommendation, including reasons and in the case of a negative recommendation the votes,

signed by the Chairperson of the Executive Committee;

c. a certification by the Executive Committee Chairperson that the Division's and University's standards and procedures for tenure review have been applied; or, if they have not, the reasons therefor and what different standards and procedures were used;

d. a copy of any specific supplement of the Division to the University's standards and procedures for contract renewal and tenure not already on file in the Office of the Dean of the Faculty and Academic Affairs.

3. The Executive Committee shall also be charged with those responsibilities listed in Sections III and IV below.

III. *CONTENTS OF THE DEPARTMENTAL (DIVISION)[2] RECOMMENDATION*

The Departmental recommendation, when it leaves the Department, should contain the following:

A. For promotions to tenure, a statement that an opening exists at that level, according to the Department's staffing needs. If no opening exists, a careful and thorough statement as to why this case is so clearly extraordinary as to require an exception in the interests of both the Department and the University as a whole.

B. A review of the candidate's scholarship and intellectual development giving:

1. a description of the distinctive nature, reputation, and influence of his or her published work, if any;

2. an evaluation of that work with respect to the goals and structure of the Department;

3. a description and evaluation of unpublished work, completed or in progress, if any;

4. a description of the potential development and influence of the person's

---

2. In the Division of Biology and Medicine, the responsibilities enumerated under Sections III and IV shall be charged to the Executive Committee.

scholarship, on the discipline, the department and the University at large.

C. A review of the candidate's teaching record at Brown;

1. describing teaching activities—i. e. specific courses taught, enrollment, independent study supervised, undergraduate and graduate theses supervised;

2. evaluating the candidate's teaching effectiveness with respect to various formats and levels of instruction; and describing students' evaluations of the candidate's teaching, with any explanatory comment summarizing the findings of the Department's program of teaching evaluation;

3. describing any special contributions the person has made either to Departmental or University curricula, or to the Department's continuing concern for its teaching effectiveness if any.

D. An assessment of the candidate's personal and intellectual service to both Department and the University.

E. An estimate of the candidate's potential for further professional growth.

IV. After a Departmental (Division) Recommendation for or against promotion to tenured rank has been reached, Administration action is initiated by receipt, in the office of the Dean of the Faculty and Academic Affairs, of the originals and eleven collated copies of the materials described in this Exhibit in Paragraph B (3) above, a properly filled-out status sheet,[3] and any examples (in single copy) of the candidate's published scholarship and teaching performance which may be useful to the Administration in its review. The steps that are next followed are these:

A. Receipt of the submitted materials will be acknowledged by the Office of the Dean of the Faculty and Academic Affairs. The materials will be examined by the Dean's Office for completeness. If any materials are lacking or if further materials might obviously be useful, they will be requested from the "tenure committee" of the candidate (Executive Committee in the Division of Biology and Medicine).

B. The Dean will then schedule a formal discussion of the recommendation by the Committee on Faculty Reappointment and Tenure. Copies of the dossier (now including the Department's (Division's) recommendation) will be distributed well in advance of the Committee's discussion to the members of the Committee. Materials not suitable for copying will be retained in the Dean's Office for use by members of the Committee and a list of those materials will be distributed with the copies of the dossier. The Chairperson of the "tenure committee" and the Chairperson of the Department will be contacted by the Dean's Office to confirm the scheduling of the discussion and to ascertain their availability, if the Committee wishes to consult with them during the meeting. (In the Division of Biology and Medicine, the Chairperson of the Section and the Chairperson of the Executive Committee shall be available to the Committee on Faculty Reappointment and Tenure in a similar capacity).

## EXHIBIT C

## ANNUAL REVIEWS

The annual review of each full-time untenured faculty member, including Lecturers and Instructors, but excluding hospital based Full Professors, shall be directed by the Department Chairperson. The annual review of each full-time untenured faculty member in the Division of Biology and Medicine, including Lecturers and Instructors, shall be directed by the appropriate Chairperson and the Dean of Biological Sciences or the Dean of Medicine.

The Department Chairperson (Dean of Biological Sciences or the Dean of Medicine) will establish and maintain a dossier on each non-tenured faculty member containing copies of: (1) official appointment and

---

3. The new status sheet form can be used to record Departmental (Division) recommendations for either promotion or non-renewal of contract.

salary letters; (2) annual reviews of the faculty member; (3) an annually revised curriculum vitae of the candidates; (4) copies of his or her scholarly publications; and (5) material on teaching performance (including student teaching evaluations and tabulations), curriculum development, and advising.

The untenured faculty member, and the Department Chairperson (Section Chairperson), will be responsible for submitting material for his or her dossier, so that it contains up-to-date material on teaching (including courses taught, student evaluations from courses and tabulations, summary material on undergraduate and graduate advising), scholarly work (including a curriculum vitae and copies of publications), and service to the University.

The annual review of each untenured faculty member will be conducted at a duly called meeting of the tenured faculty, where the contents of the individual's dossier will be reviewed and his or her performance evaluated in each of three areas: scholarship, teaching, and service. A consensus concerning the untenured faculty member's performance will be arrived at.

The annual review of each untenured faculty member in the Division of Biology and Medicine will be conducted at two levels: the Section and the Executive Committee of the Division.

(1) At a duly called meeting of the senior faculty of the pertinent section, the senior members of the Section will review the contents of the untenured faculty member's dossier and evaluate his or her performance in each of three areas: scholarship, teaching, and service. A consensus concerning the untenured faculty member's performance will be arrived at and a written evaluation report will be submitted to the Dean of Biological Sciences or Dean of Medicine for presentation to the full Executive Committee.

(2) At a meeting of the Executive Committee, the evaluation report of each untenured faculty member in the Division will be reviewed, accepted, rejected, or amended.

Such a review of an untenured faculty member's total performance will take place annually, but in some years it may coincide with the procedures for the Department's (Section's and Executive Committee's) recommendation for contract renewal, promotion or tenure. In such years the review will be conducted in time to meet University deadlines for the submission of these recommendations.

The Department Chairperson (Dean of Biological Sciences or Dean of Medicine) will meet with the untenured faculty member and present a written report which indicates the evaluation of the individual's performance by the tenured faculty of the Department (senior faculty of the Section and the Executive Committee). This evaluation report shall include a commentary on the individual's scholarship, teaching, and service. A copy of this written evaluation will be given to the untenured faculty member and every tenured faculty member in the Department. In the Division of Biology and Medicine, the report will be given to the individual, every senior faculty member in the Section, all members of the Executive Committee, and the Dean of Biological Sciences or the Dean of Medicine. In addition, a copy shall be placed in the individual's official Department (Division) file.

The untenured faculty member of the Department or Section may submit a written comment on the final evaluation report, and such comments shall be placed in the official Department (Section) file of the untenured faculty member. Lack of response by the untenured individual shall not be construed as total agreement with the final evaluation report.

### EXHIBIT D

*Committee on Faculty Reappointment and Tenure*

A. Charge

1. The Committee will review, in accordance with the staffing plan for each department, program, or division and the Affirmative Action Plan, recommendations, whether positive or nega-

tive, concerning the renewal of appointments of Instructors and Assistant Professors and the awarding of tenure to untenured faculty members and the promotion to associate and to full professor. The Committee will review positive recommendations for appointments to a tenured position of individuals from outside Brown University. The Committee will advise the President on such recommendations.

2. In its review the Committee shall give due weight to the statements and evidence gathered by the academic units sponsoring the recommendation including all the evidence submitted by the individual under review. The Committee may solicit additional evidence from within or without the sponsoring group. The Committee's review shall include consideration of procedures, of the evaluations of professional qualifications, and of institutional needs.

The procedural review shall determine whether the decision was consistent with (1) the written University Affirmative Action Plan, (2) the Department's written criteria for contract renewal, promotion, and tenure on file with the Dean of the Faculty and Academic Affairs, and (3) procedural regulations of the University.

3. The Committee shall, in its advisory capacity, either endorse the recommendation or make a recommendation of its own.

4. Recommendations for appointments, reappointments, and promotion of faculty members other than specifically described above shall be reported to the Committee. The Committee may review any of these it feels requires such review. In all cases, when a review is requested, the Committee shall undertake such a review. A review may be requested by the candidate concerned, the President, or the chairperson of the department, program, or division.

B. Operation

1. The Committee shall act only through the Dean of the Faculty and Academic Affairs or his representative.

2. Upon receipt of a recommendation, be it positive or negative, regarding the renewal of appointment promotion, or the award of tenure, the Committee shall inform the concerned faculty member that such a recommendation is under review. At the conclusion of this review, the Committee shall notify the individual and chairperson concerned of the outcome, and upon request, the rationale for its decision.

3. Prior to the conclusion of its review, the Committee shall, upon request, permit the untenured faculty member under review an opportunity to appear before the Committee and/or present materials he or she deems significant to this review.

4. The Committee shall keep minutes and the outcome of every review shall be recorded with the names of the voters and their votes; the minutes will contain the reasons for the Committee decision.

5. No member of the Committee with the exception of the Dean of the Faculty and Academic Affairs is to participate in a review involving a faculty member of his or her department, program or division.

6. The Dean of the Faculty and Academic Affairs shall present a summary report of the Committee's activities at the first meeting of the faculty each academic year.

7. The Committee shall establish its own procedures, consonant with its charge and the applicable rules of the Corporation and the Faculty, and make a written statement of these procedures available to every faculty member.

8. If the Committee finds reason to question the recommendation of the department, it will ask the department to make further explanations. In such a case the Committee may ask the department to reconsider its recommendation.

9. At the conclusion of the Committee's discussion, a vote will be taken on

whether or not the Committee on Faculty Reappointment and Tenure accepts the departmental recommendation; this vote and recommendation of the Committee shall be transmitted to the President. The record of the vote, and all other documents in the Committee's possession shall be supplied to the President. The President, thereafter, shall either declare his acceptance or rejection of the vote.

10. As soon as the President's decision is made, the Dean of the Faculty and Academic Affairs will notify the chairman of that decision, and of the reasons for it. This verbal notification will be followed by a written confirmation of both the decision and the reasons from the Dean of the Faculty and Academic Affairs to the department chairman. It is expected that the departmental chairman will notify the candidate informally as soon as possible.

11.

a. If the departmental recommendation was for promotion, and if, after review by the Committee the President approved it, notice shall be given to the person that, subject to the approval of the Advisory and Executive Committee of the Corporation, the promotion has been awarded.

b. If the departmental recommendation was for promotion, and if after review by the Committee, the President's decision is negative, notice shall be given to the person.

12. In a case of dissatisfaction with the Committee's recommendation, the department chairperson and/or the faculty member under review may ask for an opportunity to discuss the recommendation with the President in person, or to present materials in writing.

13. If the candidate or a member of the Monitoring Committee requests a review of the Committee's recommendation and the President's decision, the decision shall be reviewed by the Affirmative Action Monitoring Committee.

C. Membership

1. The Committee shall consist of the Dean of the Faculty as chairperson, four other academic administrators as appointed by the President, and five tenured faculty members to serve staggered two-year terms. The President shall be a nonvoting, ex officio member.

2. The faculty members will consist of: one faculty representative from Humanities, Social Sciences, Life Sciences, and Physical Sciences, elected by the Faculty. At least two women shall be on the Committee either as elected by the Faculty or as appointed by the Administration.

D. Method of Election

On or about March 15, the Secretary of the Faculty shall send a mail ballot to all voting members of the Faculty.

1. The ballot shall be prepared by the Committee on Nominations to insure representation of the following areas of interest: Social Sciences, Physical Sciences, Humanities, Life Sciences. In selecting members every effort shall be made to assure representation of women and minority groups. In its deliberations, the Committee on Nominations will consult with the Faculty Policy Group or its representatives. Candidates will be grouped into as many categories as there are vacancies.

2. Three faculty members shall be elected biennially and two faculty members shall be elected in alternate years for terms of two years. During the first election, which shall take place immediately after adoption of the recommendation, the ballot will designate candidates for terms of one and two years.

3. Upon expiration of his or her term, a member shall not be eligible for reelection until one year has elapsed, except that persons elected for terms of one year or less may be candidates to succeed themselves.

4. The nominee within each category receiving a plurality will be elected. In the event of a tie vote, a runoff election by mail ballot will be held to determine the winner.

5. Chairpersons of academic departments, programs, and divisions are not eligible for membership on the Committee. Members of the Faculty elected to the Committee may not concurrently serve as members of the Faculty Policy Group or the Advisory Committee on University Planning.

## EXHIBIT E

### HIRING

1. A written hiring plan is required to fill any appointed faculty position and must be approved by the EEO officer before any search takes place to fill such position.

2. A search shall be required to fill the following faculty position: full-time faculty, regular part-time faculty, special part-time faculty, and (terminal) temporary faculty.

(a) A Department, Division or Program must file a hiring plan and conduct a wide geographical search to fill a full-time or regular part-time position.

(b) A Department, Division or Program must file a hiring plan and conduct at least a modified geographical search to fill a special part-time or (terminal) temporary position.

(c) A Department, Division or Program must file a hiring plan and conduct a wide geographical search to fill any position which changes from special part-time or (terminal) temporary to full time or regular part-time. The incumbent faculty member may become a candidate for the changed position along with other qualified candidates, but should not be pre-selected. (An exception to the policy against pre-selection may be made if the initial hiring plan and job information specifies that the position will change to full time at a designated date and all candidates are so informed.)

3. Exceptions shall be allowed to the above procedures when an unexpected vacancy does not allow sufficient time to conduct the required search for such a position or when a given Department, Division or Program wishes to hire a visiting faculty member.

(a) To fill an unexpected vacancy (e. g. due to illness, disability, death, or resignation), the Department, Division or Program must file a request for a Personnel Vacancy Authorization as soon as the position is vacated. In no case shall such a position be filled for more than one year without filing a hiring plan and conducting the required search for the position.

(b) A Department, Division or Program may hire a visiting faculty member without filing a hiring plan or conducting the required search for the position, as long as such a position is filled for no more than one year by such an appointment and as long as appropriate documentation is submitted to the EEO officer confirming the visiting faculty member's credentials prior to appointment.

4. The purpose of an affirmative action search is to identify and encourage the maximum number of qualified women and other protected group candidates as possible to apply for the position.

5. In any search procedures, the Department, Division or Program must include a description of the specific efforts made to find and consider qualified women and protected group candidates and must include a statement of the parameters of the search and the steps taken to assure its adequacy.