**Louise LAMPHERE, Plaintiff,**

**v.**

**BROWN UNIVERSITY, et al.,
Defendants.**

**In The Matter of Ann W.
SEIDMAN/LUCE CHAIR.**

**Civ. A. No. 75–0140.**

United States District Court,
D. Rhode Island.

July 16, 1985.

---

Nancy Gertner, Silverglate, Gertner, Baker & Fine, Boston, Mass., for plaintiff.

Peter J. McGinn, Tillinghast, Collins & Graham, Beverly E. Ledbetter, Gen. Counsel, Providence, R.I., for defendants.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

Ann W. Seidman seeks a judgment that she is entitled to an offer of appointment to the position of Henry R. Luce Professor in the Comparative Study of Development at Brown University. Brown University denies that it has the obligation to accede to Plaintiff's demand.[1] Underlying the principal issue is a vast multitude of subsidiary issues of first impression, including the vital issue of what body is authorized to make an appointment to a prestigious university chair in a university of acknowledged high academic standing. The controversy involves a consideration of unique circumstances and requires decisions affecting the world which exists behind campus gates and ivy-covered walls, as well as how that world relates to the universe at large.

In 1977, the President of the University, the Dean of Faculty and Academic Affairs and Doctor Dietrich Rueschemeyer, Chairman of the University's Department of Sociology, submitted a proposal to the Luce Foundation to establish a Luce Professorship in the Comparative Study of Development at Brown University. It was proposed that the University would appoint a "distinguished economist who can master the challenge of integrating economic analysis with institutional sociological approaches." The University assured the Foundation that it would seek the endowment necessary "to ensure that this professorship continues after initial support from the Luce Foundation." The University proposed a joint appointment to the Departments of Sociology and Economics as a central part of the Center for the Comparative Study of Development, then being formed. The goal of the professorship was to further interdisciplinary research and

---

1. For purposes of ease of designation, and without a purpose to indicate the real adversarial interests of the parties, Ann Seidman will be referred to as Plaintiff and Brown University as Defendant. The real adversarial status of those involved is considerably more complex.

teaching on problems of both social and economic development. The incumbent was envisaged as "an economist with a distinguished record of research and teaching on socio-economic development" with "inter-disciplinary interest in development problems" who would be a "bridge builder" between the two disciplines. The professorship was to have a "catalytic effect" by "an economist with a distinguished record who is willing and able to tackle the difficult and challenging tasks of working with other social scientists across disciplinary boundaries and of advancing the integration of research and teaching on problems of the Third World," according to a January 20, 1978 letter of the President of the University.

In June of 1978, the University invited applications for the Henry Luce Professorship in the Comparative Study of Development as a permanent, tenured position. The invitation also noted that "a visiting appointment may be offered to exceptionally qualified candidates who would not be available on a permanent basis." Applications were due by October 15, 1978.

In June of 1978, the University approved what curiously was called a Personnel Vacancy Authorization (PVA). Contrary to the import of its title, the approval authorized appointment to a new position, the Henry R. Luce Professorship in the Comparative Study of Development, which was to be a permanent position in the Sociology Department with a requested salary range of $28,000 to $38,000 per year with a nine month salary base funded by a grant from the Luce Foundation. The PVA included an extensive search plan. The membership of the Search Committee, appointed by the Chairman of the Sociology Department Doctor Rueschemeyer, was stated to be "(substitutes for the Fall semester in brackets): D. Rueschemeyer, Chair, G. Borts (J. Hansen), P. Evans (R. Marsh), and S. Goldstein." The Committee reflected three specialties: Developmental Sociology, D. Rueschemeyer and P. Evans (R. Marsh), alternate; Population Studies, S. Goldstein, and Economics, G. Borts (J. Hansen) alternate.

After reviewing the applications filed, and considering the applicants teaching ability, scholarship, and publications, and after inquires to colleges and references, the Search Committee met on December 18, 1978. It voted to recommend the appointment of a Professor then teaching at U.C. L.A. (Berkeley) who was described as "one of the leading development economists in the world today" and the "only candidate ... who is fully acceptable to both departments ... based on full consultation with both the faculty in Sociology and Economics." The Committee also voted to recommend a Doctor then at the World Bank, in the event its first choice declined. The Committee recommended that in the event both declined, Plaintiff Ann Seidman be offered a three to five year term appointment. One of the members of the Search Committee testified that the reasons for the term appointment were that Plaintiff's scholarship and ability to raise funds for the Center was in question, she was not acceptable to the Economics Department, and she had not published in "leading journals." The recommendation of Plaintiff was by a vote of three to one: Professor Hansen (alternate for Borts), Marsh (alternate for Evans) and Goldstein voting approval, with Doctor Rueschemeyer opposed.

During the 1978–79 academic year Professor Alden Speare, Jr. was scheduled to succeed Doctor Rueschemeyer as Chairman of the Sociology Department. Because of overlapping sabbatical leaves it was agreed that Doctor Rueschemeyer would serve as department chairman for the first semester. The change in department chairman precipitated a complex situation.

Following the December 18, 1978 meeting, the only candidate who fitted the requirements of the PVA recommended by the Search Committee declined appointment. Because of Doctor Rueschemeyer's imminent departure for England on January 30, 1979, and in the absence of Professors Goldstein and Hansen it was not then possible in mid-January, 1979 to hold a

meeting of the Search Committee. A meeting of the tenured faculty of the Department of Sociology was called by Doctor Rueschemeyer on January 22, 1979. Between the time of the December 1978 recommendations of the Search Committee and the January 22, 1979 meeting of the tenured faculty members of the Sociology Department, Doctor Rueschemeyer had been informed by the University Provost that the Luce chair could not be a three to five year term appointment.

Exactly what was said at the January 22, 1979 department meeting is a subject of some dispute. The result was a memorandum to the Provost, drafted by Doctor Rueschemeyer and signed by him and Professor Speare, the newly-arrived department chairman. The memorandum stated in part that "We recommend that an offer be made first to Dr. Streeten and, should he decline the offer, to Professor Ann Seidman.—This recommendation has been discussed with, and has the support of, the Search Committee, the Department of Sociology and the Tenure Committee of Sociology." The position was offered to Doctor Streeten, and, in March of 1979, Doctor Streeten declined the appointment. The other shoe had dropped.

Doctor Rueschemeyer was then in England, and a novice department chairman was at the helm in the person of Professor Speare. Professor Speare and Professor Marsh, who although originally appointed as a Fall Semester substitute for Professor Evans had by then somehow become the acting chairman of the Search Committee, met with the Provost in a lengthy meeting. Professor Speare, of course, was not an original participant in the Search Committee. The participants discussed the procedural quandary then existing, because three of the four voting members of the Search Committee at the December 18, 1978 meeting disavowed a decision to recommend Plaintiff for anything other than a three to five year term appointment, and the fourth member, Doctor Rueschemeyer, had voted against that appointment as limited. They also discussed the substantive merits of Plaintiff's application. No offi-

cial action had been taken by the Search Committee or the department between the time of the offer to Doctor Streeten and the unconditional recommendation of Plaintiff as the alternate following the January 22 meeting of the department.

On March 16, 1979, another meeting of the tenured faculty of the Sociology Department was called. On the same date the Provost notified the then department chairman, Professor Speare, that the January 22 meeting was not in accord with the University's procedures since the appointment was to tenured rank, requiring a formal vote, and no formal vote had been taken at the January 22 department meeting. The Provost recommended that a department meeting be held and a vote taken. As already noted, a meeting was held on the same day as the Provost's notice.

At the March 16, 1979 department meeting it is not disputed that the tenured faculty present voted seven to two to reopen the search for the Luce Professorship rather than recommend a tenured appointment of Plaintiff, the third-ranked candidate. Counting two absent members, the vote was recorded as eight to three. Doctor Rueschemeyer, who was not present and was not contacted, was recorded as opposed to the proposal.

Thereupon, the controversy moved from the campus to the courthouse, and after two excursions back to the campus has now returned. The events which thereafter occurred will be hereafter chronicled. However, it is first necessary to digress to state the circumstances under which this litigation was brought. In order to do this, it is necessary to go back a bit in time.

This action was originally brought under Title VII, 42 U.S.C. § 2000e *et seq.*, as a class action asserting, *inter alia*, sex-based discrimination in University hiring practices. This litigation culminated, temporarily, in a Consent Decree entered September 12, 1977. *Reprinted in Lamphere v. Brown University*, 491 F.Supp. 232, 238–62 app. (D.R.I.1980). The Decree assented to by the University provided a method of resolv-

ing disputes concerning allegations of sex discrimination in hiring. Since Plaintiff, a female, had been rebuffed in her efforts for the Luce Chair after two male candidates had been recommended and declined, her situation fits neatly into the provisions of the Decree. The Decree wrought substantial changes in the conventional wisdom of Title VII litigation. It provided for the creation of an Affirmative Action Monitoring Committee (AAMC) charged with the "implementation" and "enforcement" of the Decree and authorized to hear complaints of violations of the Decree. Consent Decree, ¶ 2(L), *reprinted in* 491 F.Supp. at 241–42 app.

As it relates to this proceeding the Decree provides:

> (4) In the event that a faculty position is not filled after the prescribed search procedure, and if a female applicant for the position or a member of the Monitoring Committee questions whether the decision not to hire was or may have been discriminatory, the Department or Division, or other University official or body responsible for the decision, shall demonstrate to the Affirmative Action Monitoring Committee by clear and convincing evidence that the decision not to fill the position was nondiscriminatory as to sex and that the search procedures described in Exhibit E were complied with.

Consent Decree, ¶ 2(F)(4), *reprinted in* 491 F.Supp. at 240 app.

Upon the initiative of a female member of the Affirmative Action Monitoring Committee, the Committee undertook a review of the failure to hire Plaintiff as Luce Professor. The Committee, after hearing, determined that the University had failed to prove by clear and convincing evidence that Plaintiff was not the victim of sex-based discrimination. That determination was dated January 23, 1980.

The University then moved for a de novo consideration of the decision of the Affirmative Action Monitoring Committee. Under the provisions of paragraph 2(L) of the Consent Decree, *reprinted in* 491 F.Supp. at 242 app., the University may seek de novo consideration of any decision of the Committee by appropriate motion to the court. The University did precisely that. The court, after hearing, filed an Opinion on June 23, 1980 in which it remanded the matter to the Committee to determine if it was appropriate for the Committee to determine a remedy and, if so, what the remedy ought to be.

On July 9, 1980, the Committee determined that the Decree had vested it with the authority to fashion a remedy, and proposed a remedy which included a five year initial appointment of the Plaintiff to the Sociology Department, that she be considered for tenure by the department no later than the fourth year of her appointment, and that she be reimbursed for lost salary and expenses. The Committee in part stated "the members of the Affirmative Action Monitoring Committee differ as to whether Dr. Seidman has sufficiently impressive credentials to merit appointment to a named chair, a level of academic recognition given to few full professors at Brown University." Four of the five members of the Committee who participated in the first Committee decision of January 23, 1980 also participated in the July 9, 1980 decision. Both the applicant and the University sought de novo consideration of the July 9, 1980 decision.

After hearing, the court recommitted the matter to the Committee because its recommendation was contrary to paragraph 2(J) of the Decree which, in part, provided that the Decree was not intended to require the creation or maintenance of faculty positions. *See* Consent Decree, ¶ 2(J), *reprinted in* 491 F.Supp. at 241 app. The Committee responded with a decision dated June 2, 1983. The Committee by that time was composed of five persons, none of whom had participated in the two earlier decisions of the Committee. By a vote of four to one the newly constituted Committee voted to "suggest" as a remedy that Ann Seidman be offered the Luce Chair or a university chair. The Committee made it clear, beyond a doubt, that its decision was not to be considered one which prescribed and

imposed this remedy, but was merely a suggestion.

One other byway must be trod before coming to grips with the substantive issues in this case. It is necessary to explain the process which exists for choosing an occupant for a prestigious university chair, and set forth in more detail how the search process for the Luce Chair itself was conducted.

Exhibit E to the Consent Decree requires that a written hiring plan must be approved by the EEO officer before any search takes place to fill a position. Consent Decree, Exhibit E, ¶ 1, *reprinted in* 491 F.Supp. at 262 app. As already noted regarding the Luce Chair, Doctor Rueschemeyer submitted the search plan to the Dean of the Faculty and Academic Affairs on June 28, 1978. A Personnel Vacancy Authorization was approved by the University on June 29, 1978. The PVA stated the job requirements to be: "Economist or other social scientist concerned with economic analysis with excellent qualifications in research and teaching, who is willing and able to work with sociologists and other social scientists on problems of development and modernization; ability to integrate economic and institutional sociological analysis." The search plan which accompanied the PVA stated that the Search Committee selected by the Chairman of the Sociology Department, Doctor Rueschemeyer, consisted of D. Rueschemeyer, Chair, G. Borts, P. Evans, and S. Goldstein. During the Fall Semester of 1978, because of the absence from the campus of Professors Borts and Evans, Professor Hansen was to substitute for Professor Borts and Professor R. Marsh was to substitute for Professor Evans.

The search plan listed a number of institutions which were to be notified of the job opportunity. Applications were due to be filed in October of 1978. By December 18, 1978, the Search Committee had narrowed the number of candidates to three. On that date it voted to offer the opportunity to a professor at U.C.L.A. (Berkeley), and if he declined to an employee of the World Bank. The Committee voted three to one (Doctor Rueschemeyer, opposed) to offer to Plaintiff a three to five year term appointment.

On December 20, 1978 Doctor Rueschemeyer signed an Affirmative Action Compliance Report which stated that there were nine persons on a short list, after a consideration of thirty-eight applicants, and that if none of the persons on the short list were offered or accepted the position the search would be reopened the next year. In this report the two alternate members of the Search Committee were listed as active members and the two active members as alternates, reflecting the actual situation then existing. The Affirmative Action Compliance Report also stated that there was only one candidate who met the requirements of the PVA and that Plaintiff "was eliminated" and would not be extended an offer, along with three other candidates, because she could not "be offered a joint appointment in Economics and Sociology. The [four eliminated candidates including Plaintiff] will be reconsidered if another mode of appointment is possible."

In the course of the search, the Search Committee learned that the members of the Economics Department at Brown University were unwilling to work with Plaintiff, who was an economist. The Economics Department was unwilling to offer either Plaintiff or the second-ranked candidates a joint appointment which included the Economics Department. It was when the only candidate who met the requirements of the PVA declined the position that some changes occurred. The requirement that the position be filled with a person possessing a joint appointment in both sociology and economics was dropped. It should be noted that no written amendment of the PVA was submitted to the University's EEO officer with respect either to this change in the joint appointment requirement or the change in the membership of the Search Committee. It was determined that the appointment would be in the Department of Sociology. As a result, the Economics Department no longer had an

interest in the appointment and its member on the Search Committee (Professor Hansen) indicated he was willing to accept any candidate acceptable to the Sociology Department. Because the second-ranked candidate was a person with whom the Economics Department could work, he was offered the opportunity.

A few days before January 22, 1979, Doctor Rueschemeyer learned for the first time that the appointment could not be for a term of years such as that proposed for Plaintiff by the majority vote of the Search Committee in December of 1978. He found this out from the University's Personnel Officer. Doctor Rueschemeyer also knew that CONFRAT (the University's Committee on Faculty Reappointment and Tenure), which was required to consider the Sociology Department's recommendation concerning the appointment, was about to meet. Armed with this knowledge, and being aware that Plaintiff could not be appointed for a term of years, he called a meeting of the members of the department for January 22, 1979. Rueschemeyer was going to England at the end of the week (January 30, 1979) and both Professors Goldstein and Hansen were out of the country. Goldstein had left for Asia on January 12, 1979 and did not return until January 30, 1979. Hansen was returning during the day on January 22, 1979.

The morning of January 22, 1979, before the meeting of the members of the Sociology Department, there was a meeting of three members of the Search Committee in Professor Marsh's office. Present were Marsh, Evans and Rueschemeyer. (Hansen returned to the campus during the day.) As previously noted, Professor Marsh had been appointed to the Committee as an alternate for Professor Evans for the Fall Semester. All three, Rueschemeyer, Marsh and Evans were described as developmental sociologists; none represented either the concerns of the Department of Economics or the field of population studies.

There is no evidence that a vote of the Search Committee was taken. The evidence is that Professor Marsh stated that he had reservations concerning Plaintiff's candidacy for a tenured and prestigious chair which he would voice at the Department meeting, but that he would go along with the recommendations of the Department.

At the meeting of the Department, which lasted about two hours, Doctor Rueschemeyer stated, in response to a question concerning the recommendation of the Search Committee, that the matter was essentially in the hands of the department. Professor Marsh left for the latter part of the meeting. No formal vote was taken.

Doctor Rueschemeyer submitted a memorandum forthwith to the University Provost. In part it states that "this recommendation has been discussed with, and has the support of, the Search Committee, the Department of Sociology and the Tenure Committee of Sociology." The recommendation was to appoint the second-ranked candidate, and if he declined to appoint Plaintiff to the Luce Chair. Doctor Rueschemeyer later explained that the statement concerning the support of the Search Committee was based upon Professor Marsh's lack of objection when he was told after the meeting that the Department recommended Plaintiff and a discussion he had later that day with Professor Hansen. Hansen said the recommendation was fine with him if that was what the Sociology Department wanted; he, however, as an economist, would not interfere. Professor Goldstein was someplace in Thailand at the time, and could not be reached for comment.

The January 22 memorandum also went on to explain that the appointment then under consideration was a somewhat different appointment in that it was an appointment which did not involve a joint appointment with Economics. This memorandum, drafted by Doctor Rueschemeyer and signed by Professor Spear as Chairman of the Department, stated that the "advertisement for the position did mention a joint appointment in Sociology and Economics." The memorandum stated that the Search Committee has "reconsidered the pool of

applicants and has come to the conclusion that the pool would be essentially the same if these goals had been stated in the announcement without the specification of a joint appointment and that the candidates short listed and in particular the candidates proposed for the appointment are the best candidates for the position."

There is a total lack of evidence that this decision was ever actually made by the Search Committee. Earlier on December 20, 1978, Doctor Rueschemeyer had stated in the Affirmative Action Compliance Report signed by him that the position could not be tendered to Plaintiff and others because they could not be offered "a joint appointment in Economics and Sociology and that their candidacies would be reconsidered ... if another mode of appointment is possible."

The whole matter was at a standstill until the second-ranked candidate finally acknowledged on March 19, 1979 that he could not accept the position. At this point things began to happen which led to the conclusion by the Affirmative Action Monitoring Committee that the University had not shown by clear and convincing evidence that a reopened search was not the result of discrimination, based on the fact that a female had reached the point of serious consideration for the position after two males had declined.

It was discovered that no formal vote had been taken at the meeting of the Sociology Department on January 22, 1979, and that the result which was reported was a "consensus". Since the position is a tenured position, the Provost advised the Department that a formal vote would have to be taken. This requirement had been generally ignored in the past. The lack of a formal vote was discussed with the Provost on March 15, 1979, and restated in a memorandum from the Provost dated March 16, 1979. The tenured members of the Department met on March 16, 1979 from 8:30 to 10:30 A.M. This time it was Doctor Rueschemeyer who was absent and Professor Goldstein was present. The resulting vote was seven to two to reopen the search.

Doctor Rueschemeyer was counted as a third "no" vote. It was voted that Plaintiff could enter this new competition "without prejudice."

Fundamentally, two questions are posed: (1) what is the scope of review and (2) what disposition now should be made of the pending issues.

By ordering a new search the Sociology Department, in effect, made a decision not to hire Plaintiff. Hence, Plaintiff argues under the terms of the Decree the University had the burden of demonstrating to the Affirmative Action Monitoring Committee "by clear and convincing evidence that the decision not to fill the position was nondiscriminatory as to sex and that the search procedures described in an exhibit E of the Decree had been satisfied."

The Affirmative Action Monitoring Committee consists of five members, two of whom are selected by the "plaintiff" in the *Lamphere* litigation (this has been construed to permit the individual plaintiff in this class action to make the appointment), and two members elected by the "voting faculty" of the University. Consent Decree, ¶ 2(L), *reprinted in* 491 F.Supp. at 241–42 app. The fifth member is selected from the tenured faculty by the other four members. *Id.*

After lengthy hearings, the Committee filed the results of its deliberations on January 23, 1980. The Committee addressed three issues: (1) whether the University had violated the procedures outlined in Exhibit E of the Consent Decree concerning the appropriate method of conducting a search; (2) whether any such violations were discriminatory as to sex; and (3) whether the University violated the Consent Decree by reopening the search for a Luce Professor.

The Committee unanimously concluded that the University had violated the search procedure prescribed by the Decree. It held that the criteria applied to Professor Seidman's application relating to lack of tenure at a major university, her methodology and her alleged inability to build a bridge between the disciplines of sociology

and economics were outside the scope of the criteria established by the PVA and injurious to Plaintiff as a female. The Committee further held that it could not determine whether the violations of the prescribed procedure were based on sex. It stated, however, "this is the kind of scenario that often results from sex discrimination." By a vote of four to one, the Committee decided that the University did not "provide clear and convincing evidence that the decision to reopen the search for the Luce Chair was not based on sex." The Committee deferred a decision of what remedy ought to be provided in the circumstances. As previously indicated, two supplementary determinations concerning the appropriate remedy have been made by the Committee, with the ultimate result that the Committee suggests that Plaintiff Ann Seidman be offered the Luce Chair or a university chair.

The scope of review depends upon a construction of the provisions of a portion of paragraph 2(L) of the Decree. The Decree, in part, reads:

> In addition, the Committee shall make decisions where required and shall act as a review body where specifically required under the terms of this Decree. Further, in the event that any woman is dissatisfied with a decision of the Committee which directly affects her, she may seek de novo consideration by appropriate motion to the Court. Likewise, de novo judicial consideration of Committee decisions with respect to implementation or compliance with the provisions of this Decree may be initiated by any class member. The University may also seek de novo consideration of any decision of the Committee by appropriate motion to the Court. In hearing such motion, the Court will apply the same burden of proof as required before the Monitoring Committee.

Consent Decree, ¶ 2(L), *reprinted in* 491 F.Supp. at 242 app.

The parties are at odds over the scope of this Court's responsibility. The University argues that the Court should hear the evidence and determine the controversy anew. The Plaintiff takes positions which range from the outright adoption of the Affirmative Action Monitoring Committee's determinations to affording great weight to the Committee's determination.

The provision could have been more clearly written. Indeed much of the Decree is written in language which is less than completely informative. The difficulty is further compounded by the fact that the Decree is the consensual expression of the law of the case. It is sui generis. There are no guideposts of precedent to point the way a route that the parties have chosen not to mark well. Even the overall purpose of the Decree is unhelpful since the scope of review by the Court seems to have little or nothing to do with an effort to eradicate sex as a criterion for advancement or its lack in the academic world.

The Court permitted the Plaintiff to mark as an exhibit the documents which comprised the record of what was before the Affirmative Action Monitoring Committee in order to establish the information available to the Committee. The Court directed that counsel specifically call to the attention of the Court those portions of the extensive record which they considered to be significant. The Court did not intend to be charged with knowledge of those portions of the voluminous record unnecessary to this decision. The Court has reviewed those portions of the record specifically called to its attention by the parties.

Under the Consent Decree the Court is to provide a de novo consideration or a de novo judicial consideration to an aggrieved appellant. *See id.* The conventional definition of de novo is "Anew; afresh; a second time." *Black's Law Dictionary* 392 (5th ed. 1979). Had the scriveners of the Consent Decree but added the word "hearing," it would have been quite clear that the terms were being used in the conventional sense and that each party was entitled to a full and complete second bite at the apple. *See United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406,

2412, 65 L.Ed.2d 424 (1980). Instead the authors chose the term "consideration." In *United States v. Raddatz, supra,* the court found that the use of the word "determination" rather than hearing indicated that Congress intended a de novo "determination" to be something less than a de novo "hearing." *See also Gioiosa v. United States,* 684 F.2d 176, 178–79 (1st Cir.1982). One aspect of *Raddatz* which is lacking in this matter is the historical substitution of the word "determination" for the term "hearing" in the statutory provision. *See United States v. Raddatz, supra,* 447 U.S. at 674–75 & n. 2, 100 S.Ct. at 2412 & n. 2.

If the Decree is construed to provide something less than a full hearing by the court, the Decree has effected a shift of the enforcement machinery of Title VII to a university committee and denied a plenary judicial hearing to the parties, contrary to Title VII's provisions. *See Chandler v. Roudebush,* 425 U.S. 840, 844–45, 96 S.Ct. 1949, 1951–52, 48 L.Ed.2d 416 (1976).

In the first instance in which the effect of the *Lamphere* Consent Decree was considered, the specific issue of the effect of the Decree was not considered. The assumption of both the District Court's Opinion and the Opinion of the Court of Appeals for the First Circuit seems to have been that this was a garden variety sex discrimination case. *See Lamphere v. Brown University,* 491 F.Supp. 232 (D.R.I.1980), *aff'd,* 685 F.2d 743 (1st Cir.1982). In the District Court, the court in part stated, "In the absence of specific guidance from the consent Decree, I will adopt the standard of proof common to discrimination cases." *Id.* at 234. The court then cited *Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106 (1st Cir.1979). *See* 491 F.Supp. at 234. The court observed in a footnote that "The parties have agreed to this burden of proof." *Id.* at n. 2.

Such is not the case in this action. Plaintiff contends that Brown University has the burden to negate pretext by proving by clear and convincing evidence that when Brown filled the post it did so for legitimate nondiscriminatory reasons. Plaintiff contends that she need not prove a prima facie case nor undertake the burden of proof that the reasons given by the University are pretextual, unlike the standard garden variety sex discrimination case. Thus, Plaintiff's arguments seem to implicate the query expressed in footnote one of the District Court's Opinion in *Lamphere v. Brown University, supra* at 234, of whether a consent decree can alter the burden of proof that would otherwise apply.

This issue is, however, more apparent than real. The Defendant University argues that it has the burden of proving by clear and convincing evidence that the reason articulated by the University is the real reason for the failure to hire Plaintiff. Although Plaintiff's approach is more verbose, it does not differ in substance from that perceived to be the University's obligation by the University.

This is only to say that the parties are in substantial agreement with respect to the burden and quantum of proof. It clearly is not to say that the parties may change the burden of proof and production or the quantum of evidence required in a Title VII action. The parties, for the moment, do not make such an argument. It plainly is understood that the Court is not called upon in this present action to make such a determination.

The arguments of the parties are essentially tactical and influenced by their respective positions. The Plaintiff, who was victorious before the Affirmative Action Monitoring Committee, wishes to preserve the fruits of that victory. Hence, Plaintiff argues that, at the very least, great deference should be paid to the Committee's determinations. On the other hand, Defendant, hoping that a fresh review will leave it better off than it is now, argues for a plenary review, anew.

How the appeal process should function is shaded in this action by the advantage to be obtained from the result, and the perceived advantage essentially has determined where each of the parties stands on the issue. A better, less partial view might

be obtained if the issue were examined from the point of view of an employee who is totally denied relief by the Affirmative Action Monitoring Committee. Undoubtedly, such a disappointed claimant would espouse the position which the University takes in this action, and the University would take the position which the employee takes in this action. The effect of accepting the position of the unsuccessful appealing employee in this action would be to deny that employee, to some extent, a Title VII judicial remedy. The result would require a conclusion that the female employees of the Faculty at Brown University by virtue of a consent Decree have abandoned a full judicial remedy for one less than full.

■ This is a result not easily tolerated in connection with remedial legislation. It is a result which compels the conclusion that de novo means an opportunity anew. An absurd or patently inadequate result will not be applied to the Consent Decree. Although not discussed in the only published opinion which considers the functioning of the Consent Decree, it was assumed in *Lamphere v. Brown University, supra,* that the review by the district court was to focus on specific instances of discrimination in University employment procedures. It appears that the court made a new record and made no reference to the facts found in the proceedings before the AAMC. *See id.*

There is of course the judicial burden to be considered. The Consent Decree is an obvious attempt to resolve campus problems on the campus. In this purpose, the parties certainly are to be commended. Were it not for the Decree, there is not the slightest doubt that both the Plaintiff and the University would have a full-blown opportunity to air their differences in this Court. Although the burdens of proof and persuasion and the quantum of evidence might vary, the issue of discrimination in employment on the basis of sex is committed to this Court. Moreover, although a construction of the Decree which favors an entirely new judicial inquiry into the circumstance may require expenditure of

Court time and effort, it is neither more nor less than the remedy to which the parties are otherwise entitled.

Thus, the matter will be resolved on the Court-made record. Deference will be given, as it ought, to the Affirmative Action Monitoring Committee's decision, but those decisions do not bind the Court.

Indeed, it is the Affirmative Action Monitoring Committee's method of analysis which will be applied in this Court's effort to resolve the controversy in an appropriate fashion. In its decision of January 23, 1980, the Committee examined three issues: (1) whether the University violated the procedures of Exhibit E to the Consent Decree, (2) whether any violations were discriminatory as to sex, and (3) whether the University violated the Consent Decree by reopening the search for the Luce Professor. As will be seen, however, the Court comes to a very different conclusion.

The Affirmative Action Monitoring held that the Search Committee had met on the morning of January 22, 1979 and had voted two to one to recommend Plaintiff as the alternate candidate. It then went on to determine that because the criteria prescinding from the PVA did not support the specific criteria applied to Plaintiff's application—that is, tenure at a major university, Plaintiff's different methodology and the bridge to economics—these factors were not criteria to be applied to a consideration of Plaintiff's candidacy.

■ Taking these findings in order, it is clear beyond the slightest doubt on this record that not only was there not a meeting of the Search Committee on January 22, 1979, but also that no vote was taken at the time by the Search Committee, and most assuredly the Search Committee did not determine at any time that the pool of applicants would have been the same whether or not a joint appointment in both the Department of Sociology and Department of Economics was required. In these findings, the Affirmative Action Monitoring Committee was clearly and indisputably incorrect.

Only three persons who were connected with the Search Committee met on the morning of the January 22, 1979 before the meeting of the Sociology Department, and those were Rueschemeyer, Marsh and Evans. According to the PVA, Evans and Marsh were to share a position, with Marsh acting in the Fall Semester and Evans acting in the Spring Semester. All three were developmental sociologists. There was no two to one vote and the evidence is that there was no vote.

The Search Committee was established by the PVA which the Affirmative Action Monitoring Committee found was violated by the criteria applied to Plaintiff's candidacy. However, when it came to enforcement of the terms of the PVA with respect to who were voting members of the Search Committee, the terms of the basic search document were essentially ignored. Marsh was appointed to serve on the committee in the Fall Semester as a substitute for Evans. Goldstein was appointed because he represented a specialized area of sociology called population studies. The representative of the Economics Department was either Hanson or Borts, with Hanson being the Fall Semester representative.

The Affirmative Action Monitoring Committee dispatched these circumstances to oblivion with the observations that "It is clear that the selection committee operated informally from the very beginning of its activities. This informality is seen in both the changing composition of the committee and the fact that there were no clear rules that defined the constitution of a quorum." The Affirmative Action Monitoring Committee then went on in its decisions to strictly enforce what it perceived to be the other terms of the PVA.

There is no evidence that the Search Committee acted "informally." Indeed, the evidence is quite to the contrary prior to January 22, 1979. Plaintiff had been declared ineligible, as well as every other candidate save one. This action was taken by vote and clearly communicated in the Affirmative Action Compliance Monitoring Report signed by Doctor Rueschemeyer on December 20, 1978.

There is no evidence that the membership of the committee changed at any time, or that the department chairman, Doctor Rueschemeyer, ever took any action in writing or otherwise to change the membership of the Search Committee. The only informalities which occurred were those on and after January 22, 1979 which had the effect of reviving Plaintiff's candidacy and ultimately resulted in a representation to the Sociology Department on January 22 by Doctor Rueschemeyer that in effect the Search Committee had made a decision that the matter was "essentially in the hands of the department." No such decision was made by the designated Search Committee.

Exhibit E to the Consent Decree specifically requires a *written* hiring plan. *See* Consent Decree, Exhibit E, ¶ 1, *reprinted in* 491 F.Supp. at 262 app. In this instance the PVA must first be approved by the EEO officer of the University, before any search takes place. *See id.* The obvious purpose of the requirement of a writing and approval is to carve in stone the essential aspects of the search process in order to avoid the use of sophisticated explanations to mask discrimination. The clearly stated criteria are required in order to avoid unbridled subjective evaluation. *Johnson v. Olin Corp.*, 484 F.Supp. 577, 580 (S.D.Tex.1980).

A significant essential element is the makeup of the Search Committee. The Committee was named in the PVA. It is crystal clear that at no time was the Plaintiff recommended for the Luce Chair by a vote of the named members of the Search Committee. The Affirmative Action Monitoring Committee chose to consider the Search Committee as one with a revolving membership acting in the absence of a rule as to what constituted a quorum. Perhaps it was too obvious that with a committee consisting of four members, all four members were entitled to some prior notice of a meeting of the committee. There is no evidence of notice of any sort to Professor Goldstein before the January 22 meeting.

The makeup of the committee is significant. This appointment clearly was to effect a closer relationship between the fields of sociology and economics. One appointee was to be an economist. The recipient of the chair would be a member of both the Economics Department and the Sociology Department. The Search Committee was purposely balanced, containing two developmental sociologists, one sociologist concerned with population studies, and one member of the Economics Department.

In December of 1978, the Committee was unanimous in its determination that Plaintiff did not meet the requirements of the PVA. What did occur thereafter was an attempt to change the criteria originally established by the PVA in order to enable Plaintiff to qualify. One result was that the Committee member from the Economics Department became a somewhat disinterested spectator.

Had the criteria as originally established persisted, there would not have been an occasion to discriminate against Plaintiff because of her sex, since she would not have continued as a candidate for reasons obviously and admittedly not based on sex. It was in the later stage of the proceedings that the Affirmative Action Monitoring Committee found that the University had departed from the criteria established by the PVA and thus engaged in a scenario suggestive of sex discrimination. The University has indeed established by clear and convincing evidence that the December 1978 vote of the Search Committee was not discriminatory based on sex, but rather was based upon the criteria established by the PVA.

■ Whatever discrimination the Plaintiff endured took place after the determination that she was not qualified for the position in accord with the terms of the PVA. In December of 1978 it was clear that Plaintiff had a very poor relationship with the entire Economics Department. Inability to get along with people is a legitimate, nondiscriminatory reason. *Johnson v. Allyn & Bacon, Inc.*, 731 F.2d 64, 73 (1st Cir.), *cert. denied,* — U.S. —, 105 S.Ct.

433, 83 L.Ed.2d 359 (1984). It was this abundantly established fact that the Affirmative Action Monitoring Committee ignored when it declared with little note that the Search Committee functioned "informally".

The Court must attach as much importance to the PVA as did the Affirmative Action Monitoring Committee. It is the yardstick by which acts of discrimination can be perceived and defined. Adherence to the terms of the PVA in an objective fashion is a protection for both the job applicant and the employer. The significance of the PVA is underscored in the Consent Decree which requires that before any job solicitation, the PVA must be reviewed and approved by the University's Equal Employment Opportunity Officer. Although exact literal compliance may not be necessary, the purpose and spirit of the PVA must be observed and enforced.

The modification of the requirement of the PVA was more than a mere formal change. The University's proposal to the Luce Foundation included a joint appointment in the Departments of Sociology and Economics. This provision was incorporated in the PVA; considered in the appointment of a representative of the Economics Department to the Search Committee; stated as a fact in the notice seeking applicants prepared by the University and circulated to the concerned public; considered as a significant, if not the most significant factor distinguishing the top-rated candidate by the Search Committee when it reviewed all of the applicants credentials in December, 1978; and, was a significant factor in the offer made by the University to a UCLA professor. When that candidate declined, there was no other candidate who fit the requirements and the proposal then was modified. This was a major modification of both the PVA and the purpose of the Search Committee. It had the effect of reducing the Committee to a majority of two, since the representative of the Economics Department no longer had a significant stake in the outcome of the process and was willing to go along with the

wishes of the other members of the Committee.

■ The PVA is the hiring plan required by Exhibit E to the Consent Decree. Paragraph one of Exhibit E requires a "written hiring plan" to fill any "appointed faculty position." *Reprinted in* 491 F.Supp. at 262 app. Paragraph two requires a "search." *Id.* According to paragraph four of Exhibit E "The purpose of an affirmative action search is to identify and encourage the maximum number of qualified women and other protected group candidates as possible to apply for the position." *Id.* The Affirmative Action Monitoring Committee simply brushed aside the Search Committee's modification of the PVA as something informal and hence effectively removed the requirement which the Search Committee had found was a total bar to appointment of Plaintiff to the Luce Chair. The Plaintiff was barred from the position not because she was a woman, but because she could not secure an appointment in the Economics Department, although she was an economist. There is no evidence to suggest that her failure to secure such an appointment was in any manner linked to her sex; at least the Affirmative Action Monitoring Committee did not base its determination on such discrimination.

If the Consent Decree is to accomplish its purpose to ameliorate and eradicate sex discrimination in University employment, it must be enforced in all its particulars. The Affirmative Action Monitoring Committee simply missed the point in its reliance on actions taken long after Plaintiff was eliminated as a candidate for the Luce Chair.

Whatever standard of proof is required, it is clear beyond any doubt that the Search Committee's unanimous decision in December of 1978 was that Plaintiff was not qualified for the position and the reason had nothing to do with Plaintiff's sex. It was only after the Consent Decree was violated by an informal departure from the hiring plan as to both the makeup of the Committee and the qualifications of the applicant without approval of the EEO, as required by the Consent Decree, that the alleged discrimination against Plaintiff's candidacy occurred. This departure is fatal to Plaintiff's action in this Court and should have been considered fatal by the Affirmative Action Monitoring Committee.

Exactly how this factual situation fits into the complicated but conventional disparate impact analysis based on the *McDonnell Douglas* test need not now be determined. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). If that test applies, it is convincingly clear that Plaintiff has failed to establish a prima facie case since the Defendant University has proved by clear and convincing evidence (if that is also what is required under the Consent Decree) that she did not have the requisite qualifications for the position, and the Defendant University has not only articulated a legitimate nondiscriminatory reason, but it has proved such a reason by clear and convincing evidence (again, if the latter is what is required). *See Johnson v. Allyn & Bacon, Inc., supra* at 69–70; *Holden v. Commission Against Discrimination,* 671 F.2d 30, 35 (1st Cir.), *cert. denied,* 459 U.S. 843, 103 S.Ct. 97, 74 L.Ed.2d 88 (1982); and cases cited therein. It is also established clearly and convincingly that the reason given is not pretextual. *See Johnson v. Allyn & Bacon, Inc., supra* at 70–71; *Holden v. Commission Against Discrimination, supra* at 35; and cases cited therein.

Much indeed has been written and said by the parties which relates to events which occurred in 1979. It is unnecessary to consider those events further, since the search for a candidate to fill the Luce Chair meeting the qualifications as defined and stated was over. There was only one successful candidate and he declined. The Search Committee eliminated Plaintiff, and others, as candidates. What happened thereafter was an attempt to resuscitate an issue which this Court must declare deceased.

A form of judgment for Defendant Brown University will be submitted for costs.

SO ORDERED.